UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEWARK, NEW JERSEY

RECEIVED-CLERK
U.S. DISTRICT COURT

2005 AUG 25 P 3: 30

Plaintiff(s)

ELEANOR M. COONEY, As Executrix
of the Estate of Daniel T. Cooney, Jr.,
Deceased, and ELEANOR M. COONEY,
ELEANOR SCHIANO, HELEN E. COONEY
MUELLER, DANIEL T. COONEY, III and
ROBERT COONEY, individually,

vs.

DOCKET NO.: 04-CV-1272 (JLL)

Defendant(s)

ROBERT E. BOOTH, JR., M.D., ARTHUR R.
BARTOLOZZI, M.D., and 3B ORTHOPAEDICS,
P.C./PENN ORTHOPAEDICS and ROBERT E.
BOOTH, JR., M.D., ARTHUR R. BARTOLOZZI,
M.D., 3B ORHOPAEDICS, P.C./PENN
ORTHOPAEDICS, Personally.

*CIVIL ACTION*

## DECLARATION/CERTIFICATION STATEMENT OF UNDISPUTED FACTS

I, Helen E. Cooney Mueller, Esq., hereby states and certifies as follows:

1. I am attorney for plaintiffs in the above referenced matter and pro se. I make this Statement/certification of undisputed facts in support of plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion.

2. I reference and incorporate plaintiffs' brief and Appendix submitted with this Declaration/Certification in support of plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion.

## STATEMENT OF UNDISPUTED FACTS

1. In April, 1997, defendant, Robert E. Booth, Jr., met with Daniel T. Cooney, Jr., regarding knee replacement surgery and informed Cooney that he would "perform" Cooney's surgery. Appendix p. 19-20 - 3/01 trial transcript:

Q. And do you recall telling him words to the effect, Yes, young man, I will do the surgery for you or on you?

A. Yes.

Q. Did you promise him, at that time, that you would do the knee replacement surgery?

A. Yes.

2. On February 26, 1998, Cooney had knee replacement surgery at Graduate Hospital. There were 26 procedures/surgeries scheduled for said date (some double knee procedures or hip) Appendix p. 2 (Cooney ID # 782873) and Appendix p. 3 (age of Cooney is incorrectly stated).

3. The second operating schedule, Appendix p.3 shows that **there were six operating room designated for 3B Orthopaedics (Booth, Bartolozzi and David Nazarian, M.D) and thus multiple overlapping surgeries scheduled on February 26, 1998.**

4. Plaintiffs served a subpoena on Graduate Hospital for redacted Intraoperative Reports for each patient on February 26, 1998 which will show, with patient names redacted, the surgeon, first assistant, time surgery commenced and time surgery concluded. Plaintiffs brought Order to Show Cause, which was granted, to produce same but instead agreed to Protective Order and are awaiting same from this Court.

5. Cooney's popliteal artery was injured during knee replacement surgery on February 26, 1998, Appendix p. 56-59 (intimal flap is vascular injury).

6. After noticing Cooney's foot was cold, purple and pulseless, Cooney's cardiologist, Dr. Chamon, contacted vascular surgeon, Mark Mantell, M.D.

7. Orthopaedic defendants did not contact vascular surgeon, Mark Mantell, M.D.

8. After contact from Cooney's cardiologist, Dr. Mark Mantell commenced vascular operation on Cooney on February, 26, 1998 in attempt to repair popliteal artery that was injured during knee replacement surgery.

9. Cooney never left Graduate Hospital (transferred to Graduate Hospital Hospice on April 6, 1998) and died on April 29, 1998.

10. On February 26, 1998, date of Cooney's knee replacement surgery, plaintiff family members and other patient family members were told to wait in waiting room for telephone call from surgeon. Neither defendants, Robert E. Booth, Jr., M.D. nor defendant, Arthur R. Bartolozzi, M.D., **or anyone else** contacted plaintiffs on said date.

11. On February 26, 1998, at 6:00 p.m., the only ones left in waiting room, plaintiffs located an intern who brought them to recovery room staff who informed plaintiffs that Cooney was fine and doing well -- but that they could not see him. Plaintiffs returned to New Jersey and called recovery room staff who informed plaintiffs that Cooney had "blood clot," and to stop calling as was not serious. In early morning hours of February 27th, Dr. Mark Mantell, vascular surgeon, called plaintiffs to inform that he had operated on Cooney for approximately eight (8) hours in attempt to repair **severed artery -- condition critical.** Appendix 56-59.

12. On February 26 or 27, 1998, Booth was informed by Dr. Mantell that Cooney suffered from vascular injury to popliteal artery that occurred during knee replacement. Mantell stated in report "No thrombus [blood clot] seen." App. 56.

13. On February 27, 1998, plaintiffs ran into Booth at Graduate Hospital and Booth informed plaintiffs that Cooney suffered from a "blood clot."

14. Dr. Mark Mantell., vascular surgeon's report states that: "There was no thrombus [blood clot] seen," Appendix 56.

15. Plaintiffs never heard from Booth or Bartolozzi (never even met) again. Cooney remained in Graduate Hospital for two months until death on April 29, 1998.

16. In November, 1999, plaintiffs filed an action in the District Court of New Jersey for inter alia, medical malpractice, Count One, and battery, Count Two -- see Counts One and Two, Appendix p. 90 - at p. 91 and 100. Plaintiffs also alleged fraud, Count Three, Appendix p. 106, in that Booth falsely concealed true nature of Cooney's condition by falsely informing plaintiffs that Cooney suffered from a "blood clot" as opposed to actual vascular injury, see above. The matter was transferred to the Eastern District for Pennsylvania in January, 2000. In May, 2000, Frederick Klepp, Esq. became attorney for plaintiffs. Defendants agreed to call Cooney condition, vascular injury, and case proceeded only for medical malpractice and battery.

17. Medical records for Cooney including Intraoperative Report, Appendix p. 11-12; Bill to Medicare, Appendix p. 1; Operating Schedule, Appendix p.2 (Cooney ID # 782873); and Resident's, David McHugh, notes, Appendix p. 44 (attached to deposition p. 37-43) -- designate defendant, Arthur R. Bartolozzi, M.D. as surgeon for Cooney.

18. At deposition, resident, David McHugh, who is listed as first assistant to Bartolozzi on Cooney's Intraoperative Report, Appendix p. 11-12, denied performing Cooney's surgery. While he did not recall who performed Cooney's surgery, his notes stated that Bartolozzi was surgeon, Appendix p 37-43 deposition and note at p. 44). Plaintiffs voluntarily dismissed McHugh from action.

19. At deposition, Bartolozzi denied performing Cooney's surgery and stated he (Bartolozzi) had **no participation** in any portion of Cooney's surgery except for beginning and end, Appendix p. 17-18:

Q. What parts of the surgery did your participate in Mr. Cooney's surgery?

A. The initial part of the surgery involves applying the drapes and the surgery involves applying the drapes, establishing the surgical field, making an exposure to the knew, beginning the initial phases of knee replacement surgery, removing the bony osteophytes and preparing themselves for the actual replacement procedure.
Appendix p. 17.

Q. Okay. Now other than the procedure that you've just described that you were involved in with respect to Mr. Cooney's operation, were you involved in any other part of Mr. Cooney's operation?

A. I was involved at the end of the procedure with the -- with the -- at the end of the cementation or the part -- cementing of the parts. The exposure and the

area is irrigated with an antibiotic liquid and then the wound is closed. The deep issues are closed and then the skin is closed and then staples are applied.
Appendix p. 18.

Q. Was Dr. Booth involved in the operation.

A. His involvement is **in soft tissue, ligament balancing, participating with the bony cuts, application of the trial prosthetic devices that are the sizes that we'll ultimately use** *and once the parts are applied and cemented.*
Appendix p. 18.

Bartolozzi also testified that he did not know why he was listed as surgeon.

Q. Okay. Do you know why you were listed as surgeon along with other physician whose name you cannot decipher? [it is not a physician whose name Bartolozzi cannot decipher but rather D. Holmes -- surgical assistant].

A. No.
Appendix at p. 18.

20. At deposition, Booth testified that he was present during critical portions of Cooney's knee replacement surgery, Appendix 53-55.

A. Dr. Bartolozzi was there as well as my partner, but I'm the -- primarily the one responsible for Mr. Cooney, and I was there for the cutting of the bone, **certainly all of the soft tissue preparation,** and leaving as the parts are being cemented into position.
Appendix p.53.

21. In March, 2001, prior to trial, the district trial court judge dismissed Bartolozzi from the Cooney action via defendants' Motion for Summary Judgment.

22. At trial, Booth testified that Bartolozzi was the surgeon, Appendix p. 19-31a, that Bartolozzi was his "soft tissue" expert, and that he (Booth) no longer performed this portion (soft tissue and ligament balancing) of surgery and that Bartolozzi was expert and "gift" to him, that the soft tissue and ligament balancing portions of the surgery were the **most critical portions** to a knee replacement surgery, that **he entered Cooney's surgery after soft tissue had been performed**, and left when permanent prosthesis was being placed.

Q. And does that document reflect the name of the surgeon?

A. Yes.

Q. Who is it?

A. The name listed here is Dr. Bartolozzi, first assistant Dr. McHugh. Appendix p. 31a.

---

A. Art Bartolozzi is my sports partner, but he's very good with soft tissues, and ligaments, and he takes care of the pro teams.
Appendix p. 21.

Q. When you said that Dr. Bartolozzi, you told us earlier deals with soft tissue, what does that mean.

A. ... **Repairing the cruciate ligaments and other ligaments around the knee is -- is a different art. I don't -- I used to do that years ago, but I don't do that too much anymore.** I'm more into the hard tissue, the parts, the bones, et cetera. ... but we learn for ourselves, and so that's Bartolozzi's gift to me over the years has been a better understanding of balancing of the soft tissues.

...

So the best total knees are those which not only have the parts properly aligned on the bones, but also restore the soft tissue balance, because as I said, the soft tissues, the ligaments, tendons, and muscles, are what hold it all

together and make it move. And if that's not good, then even the most attractive x-ray won't work -- as a proper knee.

Q. And I believe you said that Dr. Bartolozzi is involved in sports medicine?

A. Yes.

Q. And deals with more of the tendons and that than you do?

A. Yes.

Appendix 21-25.

---

A. After that's done, the knee is flexed like this, some more soft tissue is taken away up top to expose the bone, and then, as you can see, the knee starts to come forward a little bit, and these tissues, if they're there are taken out... And, what's then done is that one of these retractors is then put into the back of the knee right over the ligament.

...

**The ligaments are taken out in the back** with the retractor protecting everything. Remember I told you that the blood vessels run behind the knee, so all of this protects the back of the knee. **And this is the point where I entered this case with Dr. -- so we then moved Dr. McHugh out of the way, and Dr. Bartolozzi and I used a guide to cut off the top of the bone with a saw....** Appendix.p. 26-27.

...

It's like putting toothpaste on you brush in the morning, it's pretty simple, it comes out of a caulking gun. Put the parts, on put the knee out straight, and that's the **point where I left the operation , as those parts were being put on.**

Appendix p. 30.

...

> Q. Therefore, you did not take or push Mr. Cooney into recovery room?
>
> A. No.
>
> Q. Okay. You remained in the operating room then attending other patients?
>
> A. Until some later time, yes.

Appendix p. 31.

23. Bartolozzi testified in deposition that he (Bartolozzi) did not participate in Cooney's surgery except for beginning and end.

24. Booth's trial testimony differed from Booth's deposition in that he (Booth), contrary to deposition where he stated he was "**certainly present for all of the soft tissue preparation**, Appendix p. 53, -- now testified at trial that he **was not present for soft tissue and that this was Bartolozzi's area as he (Booth) no longer performs the soft tissue portion of surgery and is more into hard issue portions of surgery.**

25. At trial Booth admitted Bartolozzi was designated surgeon. Further, Booth claimed he entered surgery after soft tissue ligament balancing had been completed, assisted Bartolozzi with the bone cutting, and left when permanent prosthesis was being placed. Bartolozzi stated in deposition that he did not participate in any portion of surgery other than beginning and end and that Booth was responsible for all portions **including** soft tissue and ligament balancing, and bone cutting.

26. Booth's trial testimony that Bartolozzi was surgeon and performed the critical portions of surgery, including soft tissue and ligament balancing, is in conjunction with **all document evidence including Intraoperative Report, Operating Schedule, Medicare bill, and McHugh notes,** above, designating Bartolozzi as surgeon.

27. **There were no other orthopaedic surgeons, other then Bartolozzi and Booth, that were disclosed by defendants regarding Cooney's surgery.**

28. Plaintiffs proceeded with battery claim versus Booth in that Bartolozzi had performed Cooney's knee replacement surgery rather than Booth which plaintiffs asserted was contrary to promise Booth made to Cooney that he (Booth) would perform Cooney's surgery. Plaintiffs relied on Grabowski v. Quigley, 454 Pa. Super. 27, 684 A.2d 610 (1996), appeal granted, 548 Pa 670, 698 A.2d 594 (1997), appeal dismissed, 717 A.2d 1024 (1998) (surgeon who authorized another surgeon to perform surgery is liable for battery).

29. While identity of surgery was left blank on consent form, Appendix p. 15-16, both Bartolozzi and Booth were then listed as possible surgeons for Cooney. Jury returned verdict in favor of defendants. Plaintiffs appealed battery charges.

30. Third Circuit affirmed the district court, Appendix 46-52, specifically stating that "Dr. Arthur Bartolozzi performed bulk of the surgery," Appendix p.46.

31. In or about June, 2002, plaintiffs discovered over the Internet that defendant, Booth, had been investigated for Medicare Fraud for having "residents

perform surgery without the presence of surgeon," Appendix p. 62 - dated June 30, 2002. Plaintiffs obtained Settlement and Integrity Agreement through law firm in Washington, D.C., Appendix 63 - envelope containing Settlement/Integrity Agreement; and Appendix p. 64- letter from Eastern District of Pennsylvania enclosing Complaint for Medicare Fraud versus Booth. The investigation was pending during plaintiffs' trial but the Complaint along with Settlement Agreement was not filed in federal court until after plaintiffs' trial in August, 2001, Appendix p. 64-67 (entire Agreements not provided as too lengthy) and Appendix p. 69-82.

32. The Medicare Fraud investigation versus Booth commenced in April, 1997 and covered period from January, 1995 to June, 1997 while defendant, Booth, was at Pennsylvania Hospital.

33. Defendant, Booth, moved from Pennsylvania Hospital in July, 1997 and transferred to Graduate Hospital. Medicare Fraud investigation at Pennsylvania Hospital ceased when Booth transferred to Graduate Hospital.

34. Defendant, Booth, returned to Pennsylvania Hospital in 1998. See defendants' Appendix - Philadelphia Business Journal.

35. The Medicare Fraud complaint alleged that Booth violated federal statutes and regulations and common law fraud. The Medicare Fraud complaint alleged that residents were performing surgeries without the presence of Booth and that **there were no surgeon's notes for those rooms that Booth was not present,** Appendix 69-82.

36. Defendant, Bartolozzi submitted bill for Cooney's surgery to Medicare, Appendix, p.1.

37. According to federal regulations, 42 C.P.R. 415.170, et seq. when bill is submitted to Medicare, **Bartolozzi bill submitted to Medicare,** Appendix p.1, and there are multiple overlapping surgeries, presence of surgeon must be documented for all critical portions of surgery. Further, while residents may open and close, surgeon cannot commence new surgery and rather must be immediately available to return to former operating room, see 42 C.PR. 415.170, et seq. and Medicare Fraud Complaint, Appendix p. 69-82.

38. **Defendants have denied the existence of surgeons notes for Cooney or any other patient on February 26, 1998,** Appendix p. 4 - April, 2005 letter.

39. The second operating schedule, Appendix p. 3 shows that there were six operating room for 3B Orthopaedics (Booth, Bartolozzi, and David Nazarian - see first operating schedule, Appendix p. 2), that there were 26 procedures to be performed on February 26, 1998 for 18 patients (some of the surgeries were double knee replacement, some of the surgeries were single knee replacement/revision, some of the surgeries were hip replacement/revision).

39. The second operating schedule, Appendix p.3, shows that multiple and overlapping surgeries were scheduled for February 26, 1998 in that several surgeries were scheduled for 7:00 a.m., 9:00. a.m., 11:00 a.m., etc.

40. Plaintiffs served subpoena for redacted Intraoperative Reports for February 26, 1998 from Graduate Hospital.

41. The redacted Intraopertive Reports for each patient (18 patients) and 26 surgeries will demonstrate the surgeon, first assistant, time surgery commenced and concluded for each patient on February 26, 1998.

42. Defendants and Graduate Hospital informed plaintiffs that the subpoena to Graduate Hospital was in violation of federal law in that plaintiffs had to notify all patients that they were seeking their redacted records. When plaintiffs agreed to notify the patients and needed addresses for same, the defendants and Graduate Hospital refused to forward addresses. Appendix p. 88-89. Plaintiffs brought Order to Show Cause which was granted. Graduate Hospital then sought Protective Order whereby plaintiffs **could not provide a copy of these documents to the other patients or anyone else.** Plaintiffs agreed to Protective Order and are awaiting same from this Court. Plaintiffs will forward same to this Court as part of Appendix as soon as received.

43. At deposition, Booth testified that the February 26, 1998 Operating Report, Appendix p. 13-14, is simply a "**computer generated form ... typed up from a template, from a form,**"and therefore is the same for every patient unless there is a problem/variation, Appendix at 53-55 at p. 53.

44. The Operating Report, Appendix 13-14, shows average 50cc loss of blood for Cooney, Appendix p. 13-14, as opposed to Cooney actual loss of blood on February 26, 1998 which was 2500cc, Appendix p. 56-59 (Mantell Intraopertive Report). Cooney's actual blood loss varies significantly from the Operating Report **form/template.**

45. In his deposition, Booth claimed that he left Cooney surgery to go on to another surgery, Appendix 53-55.

Q. Okay. When you left Mr. Cooney during the course of the surgery at the time that the cementing was being done and the closing, did you go on to another patient in the operating room?

A. Yes.

Appendix p. 54.

46. Pursuant to federal regulations for Medicare billing, surgeon's presence must be documented for the critical portions of the surgery. Further, surgeon cannot commence new surgery but must be immediately available to return to form surgery.

47. **No such documentation documenting the presence of either Booth or Bartolozzi during critical portion of Cooney's surgery exists other then the Operating Report, Appendix 13-14, which, as testified by Booth, is simply a form template and does not vary from patient unless a problem or variations occurs. Defendants have denied the existence of "surgeon notes,"** Appendix 4.

48. McHugh deposition states similar "various" room pattern as alleged in Medicare Fraud Complaint, Appendix 37-43 at 41-42.

49. Plaintiff, Helen Mueller, testified at deposition that she heard "rumor" from former attorney, Louis Fine, who heard from former defendant Mark Mantell, M.D., vascular surgeon, that Booth was being investigated for Medicare Fraud for having "assistants" perform surgeries, see Defendant's Appendix for Mueller deposition.

50. The term "assistants" can mean another surgeon, ie. Bartolozzi.

51. Defendants' Motion for Summary Judgment states in paragraph three (3) that: Dr. Booth **was assisted** by co-defendant, Arthur R. Bartolozzi, M.D.

52. Dr. Mantell denied to plaintiffs that he had stated Booth was being investigated for Medicare Fraud.

53. The Medicare Fraud investigation versus Booth was **sealed/confidential** during Cooney medical malpractice litigation and only defendants had access to same.

54. During deposition, defendant Booth, denied existence of any pending federal actions, Appendix p. 53-55. Referring to actions versus defendant, Booth, plaintiffs' attorney asked Booth at deposition:

Q. All right. And I'm sorry, did you say that they were all pending here -- those that have involved you as a defendant have been filed in courts in Philadelphia?

A. Yes.

Q. Okay. **Federal court or --**

A. Civil.

Q. Commonwealth court?

A. Commonwealth.

Appendix p. 55.

55. The pending Medicare Fraud investigation versus Booth was both **civil and criminal.**

56. At deposition, Booth denies existence of federal actions and states Commonwealth (meaning Pennsylvania state) and does not disclose the criminal investigation but rather states only "civil" actions.

57. Federal perjury statute 18 U.S.C. sec. 1621 was expanded by sec. 1623 which changed definition of intent from willfully offering false testimony to merely have knowledge that the testimony is false.

58. Prior to trial, defendants made Motion in Limine to preclude any reference to possible Medicare Fraud investigation versus Booth and made representations that same was "irrelevant" to plaintiffs claims versus defendants, Appendix 32-36.

59. Plaintiffs have been unable to obtain additional information from the United States Department of Justice, other than Medicare Fraud Complaint/Settlement Agreement filed in August, 2001, as while the case is closed the information is still deemed "confidential" and cannot be obtained through the Freedom of Information Act, Appendix p. 86-87, unless Booth consents to same.

60. Plaintiffs have appealed the denial of this information to the appeals department of the United States Department of Justice.

61. In June, 2002, plaintiffs brought a F.R.C.P. 60 (b) Motion for Fraud and Fraud on the Court (fraud on court alleged defendants defrauded Medicare and attorneys were complicit).

62. The trial judge denied Motion as plaintiffs' Motion was beyond one year statute of limitations, Appendix p. 9-10.

63. The Third Circuit affirmed trial court's decision as to plaintiffs' Motion for Fraud based **solely on fact that it was beyond one year motion statute of limitations.** Appendix p. 5-8.

64. Contrary to district court, Third Circuit found fraud on court motion, as opposed to plaintiffs fraud motion, to fall within savings clause and thus not subject to one year statute of limitations, it concluded fraud on court allegations to be "without merit" (no further explanation).

65. Plaintiffs filed the within independent action for Legal Fraud and Equitable Fraud based on R. 60 (b) in that independent equitable action can be filed if motion for fraud is beyond one year statute of limitations.

66. Plaintiffs only allege Legal and Equitable Fraud in that defendants fraudulently failed to disclose the pending Medicare Fraud investigation versus Booth which was critical to plaintiffs' battery claim. Plaintiffs do not allege fraud on the court.

67. Defendants represented to this Court that they had MIIX Insurance and, therefore, that the within matter was subject to state court order Staying all actions involving MIIX insurance while MIIX rehabilitation matter was pending.

68. Defendants' MIIX Insurance only refers to defendants' insurance within defendants' capacity as employees of Graduate Hospital.

69. Defendant, Booth, was Director of Resident Education and Training while at Graduate Hospital.

Under penalty of perjury, I hereby certify and affirm that the foregoing is true and correct to the best of my knowledge and belief.

Dated: August 22, 2005

Helen E. Cooney Mueller (HCM 4226)
Attorney for Plaintiffs and pro se
11 Susan Avenue, Wayne, N.J. 07470
(973) 633-8021
helenelmueller@yahoo.com