# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEWARK, NEW JERSEY

Plaintiff (s)

ELEANOR M. COONEY, As Executrix
of the Estate of Daniel T. Cooney, Jr.,
Deceased, and ELEANOR M. COONEY,
ELEANOR SCHIANO, HELEN E. COONEY
MUELLER, DANIEL T. COONEY, III and
ROBERT COONEY, individually,

DOCKET NO.: 04-CV-1272 (JLL)

vs.

Defendant (s)

ROBERT E. BOOTH, JR., M.D., ARTHUR R.
BARTOLOZZI, M.D., and 3B ORTHOPAEDICS,
P.C./PENN ORTHOPAEDICS and ROBERT E.
BOOTH, JR., M.D., ARTHUR R. BARTOLOZZI,
M.D., 3B ORHOPAEDICS, P.C./PENN
ORTHOPAEDICS, Personally.

*CIVIL ACTION*

## PLAINTIFFS' APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION.

Helen E. Cooney Mueller (HCM 4226)
Attorney for Plaintiffs
11 Susan Avenue
Wayne, New Jersey 07470
(973) 633-8021
helenelmueller@yahoo.com

## TABLE OF CONTENTS

**PAGE NOS.**

February 26, 1998 Medicare Bill submitted by Bartolozzi   1

February 26, 1998 Operating Schedule   2

February 26, 1998 Operating Schedule   3

April 19, 2005 letter from Paul E. Peel, Esq. - "surgeons notes do not exist"   4

September 7, 2004 Third Circuit decision   5-8

January 30, 2003 Eastern District of Pennsylvania decision   9-10

February 26, 1998 Intraoperative Report designating Bartolozzi as surgeon   11-12

February 26, 1998 Operating Report   13-14

February 26, 1998 Consent Form   15-16

September 22, 2000 Bartolozzi deposition   17-18

March, 2001 trial testimony of Booth   19-31 & 31a

Defendants March, 2001 Motion in Limine   32-36

Resident, McHugh August 18, 2000 deposition   37-43

Resident, McHugh, February 26, 1998 note   44-45

February 12, 2002 Third Circuit decision   46-52

July 14, 2000 Booth deposition   53-55

February 26, 1998 Mark Mantell, M.D. Operative Report   56-59

AM News staff, May 19, 2003, "Suite claims unnecessary surgeries at Tenet"   60

Health Law Litigation Reporter, Jason Schossler, Wednesday, January 19, 2005, "Tenet Pays $395 Million to Settle Heart Surgery Suit"   61

Recent Medicare Settlements, June 30, 2002 - Fried, Frank, Harris, Shriver & Jacobson, Attorneys at Law, Washington, DC   62

July 1, 2002 envelope from Fried, Frank, Harris, Shriver &
Jacobsen, Attorneys at Law, Washington, DC                              63

August, 2001 Settlement and Integrity Agreement versus Booth
(partial copy of Agreements)                                           64-67

U.S. District Court Eastern District of Pennsylvania dated
July 16, 2002 enclosing copy of Medicare Fraud Complaint
versus Booth                                                            68

August, 2001 Medicare Fraud Complaint versus Booth                     69-82

May 10, 2001, "Securities Fraud - Civil False Claims Act: Recent
Securities Fraud Suit Based on Failure to Disclose Qui Tam Suit,"
Fried, Frank, Harris, Shriver & Jacobsen, Attorneys at Law,
Washington, DC                                                         83-85

U.S. Department of Justice denial of plaintiffs' FOIA request regarding
Medicare Fraud investigation versus Booth, July, 2005                   86-87

July 1, 2005 letter from Andrew Kessler, Esq., attorney for
Graduate Hospital regarding obtaining addresses of other 2/26/98
patients so they can be notified prior to obtaining redacted records    88

July 12, 2005 letter from attorney for defendants regarding denial of
access to other patients' addresses                                     89

November, 1999 complaint versus defendants for medical malpractice
and battery                                                            90-113

Redacted Intraopertive Reports for all patients on 2/26/98      To be supplied

# THIS IS NOT A BILL

# Explanation of Your Medicare Part B Benefits

|||..|..||..||..||..||..||..||..||..||..||..||..||..|..|..|..|
DANIEL COONEY
8 ERLI ST
WAYNE NJ   07470-4303

**Summary of this notice dated April 20, 1998**

| | | |
|---|---|---|
| Total charges: | $ | 6,460.00 |
| Total Medicare approved: | $ | 1,818.92 |
| We paid your provider: | $ | 1,455.14 |
| Your total responsibility: | $ | 363.78 |

Your Medicare number is: 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A

Your provider **accepted** assignment

Details about this notice (See the back for more information.)

BILL SUBMITTED BY: Allegheny University Of Hlth
Mailing Address:
The Orthopaedic Hosp
Po Box 820447
Phila          PA 19182

| Dates | Services and Service Codes | Charges | Medicare Approved | See Notes Below |
|---|---|---|---|---|
| | Control number 21-8079-077-12-00 | | | |
| | Arthur Bartelomei M.D. | | | |
| Feb 26, 1998 | 01 Total knee replacement [27447-GCLT] | $ 6,460.00 | $ 1,818.92 | a |

Notes:

a   This is the maximum approved under the Medicare fee schedule for this service.

IMPORTANT: If you have questions about this notice...
1-888-746-5680, or write...
To appeal our decision, write to us at Medicare...
the fill on the back.

Atlas 3.30
Crichlule Hospital

| MRN | Visit ID | Admit Date | Disch Date | Proc Code | Proc Date | Proc Descr | Px Proc | Surgeon |
|---|---|---|---|---|---|---|---|---|
| 791384 | 3634458 | 02/26/1998 | 03/03/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| 798998 | 3648151 | 02/26/1998 | 03/01/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |
| 799000 | 3648169 | 02/26/1998 | 03/02/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| 799005 | 3648201 | 02/26/1998 | 03/01/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| 790971 | 3648219 | 02/26/1998 | 03/02/1998 | 8151 | 02/26/1998 | Total Hip Repl | 65128 | David Nazarian |
| 798729 | 3648227 | 02/26/1998 | 03/01/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |
| 644895 | 3648235 | 02/26/1998 | 03/01/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| 799011 | 3648250 | 02/26/1998 | 03/01/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| 793986 | 3648268 | 02/26/1998 | 03/02/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| 799029 | 3648334 | 02/26/1998 | 03/02/1998 | 8151 | 02/26/1998 | Total Hip Repl | 65128 | David Nazarian |
| 799034 | 3648342 | 02/26/1998 | 03/03/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| 456785 | 3648441 | 02/26/1998 | 03/02/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |
| 453847 | 3648508 | 02/26/1998 | 03/04/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65128 | David Nazarian |
| 799565 | 3651841 | 02/26/1998 | 03/03/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| 799631 | 3651882 | 02/26/1998 | 03/01/1998 | 8155 | 02/26/1998 | Revis Knee Repl | 65120 | Robert Booth |
| 799584 | 3651890 | 02/26/1998 | 03/01/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |
| 798632 | 3648185 | 02/26/1998 | 03/02/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| | | | | 8154 | 02/26/1998 | Total Knee Repl | 65120 | Robert Booth |
| 782873 | 3648144 | 02/26/1998 | 04/08/1998 | 8154 | 02/26/1998 | Total Knee Repl | 65122 | Arthur Bartolozzi |

****** 2000 MediQual Systems Inc. ******

Attachment "D"

2

SM HOLDEN & FM KLEPP    H5D589C2106    P.5

12 Jul 00  1420

## TUTTLEMAN OPERATING ROOM SCHEDULE

### FOR THURSDAY, FEB 26, 1998

| OR TIME  ROOM PATIENT'S NAME | AGE OPERATIONS SCHEDULED | SURGEONS | ANES EQUIPMENT CONSULTS |
|---|---|---|---|
| T1 07:00│O16-│WILLIAMS,BRIAN | 40│RT KNEE(S) SURGICAL ARTHROSCOPY | │Balduini,F | │GEN │ |
| 13:00│O16-│MASTER,CHRISTINA | 31│LT KNEE(S) SURGICAL ARTHROSCOPY, ACL RECONST W/ | │Gregg,J. | │GEN │ |
| | ALLOGRAFT (& LATERAL MENISCAL REP.) | │arogg,J. | │GEN │ |
| 15:30│O16-│CIRIELLO,MICHAEL | 30│LT KNEE(R) SURGICAL ARTHROSCOPY, ACL RECONST W/ | | |
| | ALLOGRAFT | | |
| T2 07:30│O18-│GORDON,MICHAEL, SR. | 52│RELEASE (GUYONS CANAL ANTERIOR TRANSPOSITION | │Trager,S | │BLK │ |
| | ULNAR NERVE AT ELBOW) | │Trager,S | │GEN │ |
| 09:30│O15-│DIPIANO,MICHAEL | 41│OPEN LT ROTATOR CUFF REPAIR | │Trager,S | │BLK │ |
| 11:00│O15-│SMELTON,JAMES W. | 53│LT TRIGGER FINGER RELEASE (LONG & RING FINGERS) | | |
| T3 07:00│O18-│KOSMALSKI,EDWARD R. | 52│LT KNEE(S) SURGICAL ARTHROSCOPY | │B/S/D/N | │A/C │ |
| 08:00│O18-│DARBY,ROBERT J. | 58│RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| T4 07:00│O15-│KATZ,ADA | 79│RT TOTAL KNEE ARTHROPLASTY (IB-PS) | │B/S/D/N | │A/C │ |
| 12:00│O16-│PHILLIPS,MARGARET | 73│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| T5 07:00│O16-│MARTIN,CHESTER W. | 69│LT TOTAL HIP ARTHROPLASTY (TAPERLOC) | │B/S/D/N | │A/C │ |
| 09:00│O16-│COONEY,DANIEL | 62│LT TOTAL KNEE ARTHROPLASTY (IB-PS) | │B/S/D/N | │A/C │ |
| 11:00│O16-│BELZINGARO,KATHLEEN L | 59│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| 14:00│O16-│WEST,JOHN J | 39│RT TOTAL HIP ARTHROPLASTY (TAPERLOC, 8-8) | │B/S/D/N | │A/C │ |
| T6 07:00│O15-│DEANE,CHARLES C | 67│LT TOTAL KNEE ARTHROPLASTY (IB-PS) | │B/S/D/N | │A/C │ |
| 00:00│O15-│DONAHUE,MARGARET | 79│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| 12:00│O15-│KOZAK,MARY JEAN | 59│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| T7 07:00│O15-│WELDSTEIN,CECELIA | 79│LT TOTAL KNEE ARTHROPLASTY (IB-PS) | │B/S/D/N | │A/C │ |
| 09:00│O16-│WEBNER,PEARL J | 77│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| 13:00│O15-│HOPSTROM,HELEN R | 77│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |
| T8 07:00│O15-│REILLY,CATHERINE | 69│LT TOTAL KNEE ARTHROPLASTY (IB-PS) | │B/S/D/N | │A/C │ |
| 09:00│O15-│MERRITT,MARY KAY | 57│RT TOTAL KNEE ARTHROPLASTY (IB-PS, CCK) | │B/S/D/N | │A/C │ |
| 11:00│O15-│GUTAM,WILLIAM | 61│REV RT TOTAL KNEE ARTHROPLASTY (CCK, LONG STEM, | │B/S/D/N | │A/C │ |
| | CELL SAVER) | | |
| 13:00│O15-│BUTVEL,WALTER J. | 76│ RT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | │B/S/D/N | │A/C │ |
| | LT TOTAL KNEE ARTHROPLASTY (IB-PS, CELL SAVER) | | |

Tw

3

# O'BRIEN & RYAN, LLP
## ———— ATTORNEYS AT LAW ————

Hickory Pointe
2250 Hickory Road, Suite 300
Plymouth Meeting, PA 19462-1047
Main: (610) 834-8800
Fax: (610) 834-1749
www.obrlaw.com

Paul E. Peel
Direct Dial: (610) 834-6125
Email: ppeel@obrlaw.com

April 19, 2005

*Via Facsimile and First Class Mail*
Helen E. Cooney Mueller, Esquire
*Cooney & Mueller*
11 Susan Avenue
Wayne, New Jersey 07470

    RE:    Cooney v. Booth, M.D., *et al.*
           Docket No.: C-04-1272 (JLL)
           <u>Our File No.: 55034</u>

Dear Mrs. Cooney-Mueller:

    Please allow this letter to confirm our telephone conversation of yesterday afternoon, April 18, 2005, during which you agreed to extend the time period for defendants to produce the face-sheets regarding defendants' insurance policies for the years 1998 and 2001-2005 until Wednesday, April 20, 2005. I expect to receive these documents tomorrow and I will immediately forward them to your attention upon my receipt of them.

    As for your request for copies of the top portion of the intra-operative reports for all surgeries performed by Robert E. Booth, Jr., M.D. and Arthur R. Bartolozzi, M.D. on February 26, 1998, with personal identifying information redacted, please be advised that my clients are not in possession of any such documents. If these documents still exist, they are most likely in the possession and control of Graduate Hospital.

    Finally, with respect to your request for "surgeon's operation notes" for Daniel Cooney, please be advised that our clients have confirmed for me that no such documents exist.

    Should you have any questions concerning this matter, please do not hesitate to contact me.

    Very truly yours,

PAUL E. PEEL

4

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-2652

———————

ELEANOR M. COONEY, As Executrix of the
Estate of Daniel T. Cooney, Jr., Deceased;
ELEANOR M. COONEY; ELEANOR SCHIANO;
HELEN E. COONEY MUELLER; DANIEL T. COONEY, III;
ROBERT COONEY INDIVIDUALLY,

Appellants

v.

ROBERT E. BOOTH, JR.; ARTHUR R. BARTOLOZZI;
DAVID MCHUGH, (FICTITIOUS FIRST NAME); DAVID G. NAZARIAN;
JOHN DOE, (FICTITIOUS NAME); BOOTH, BARTOLOZZI, PENN ORTHOPEDICS;
MARK MANTELL; RECOVERY ROOM STAFF;
JANE DOE, JOHN ROE, ET AL, (FICTITIOUS NAMES);
GRADUATE HOSPITAL, (FORMERLY ALLEGHENY GRADUATE HOSPITAL);
PENNSYLVANIA HOSPITAL; ROBERT E. BOOTH, JR.; MARK MANTELL,
PERSONALLY;
BOOTH, BARTOLOZZI, BALDERSON, PENN ORTHOPEDICS, CORPORATION;
DENNIS MCHUGH

———————

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 00-cv-01124)
District Judge: Honorable Eduardo C. Robreno

———————

Submitted Under Third Circuit LAR 34.1(a)
March 22, 2004

Before: ROTH, AMBRO AND CHERTOFF, CIRCUIT JUDGES

*5*

(Filed: September 7, 2004)

---

OPINION

---

ROTH, <u>Circuit Judge</u>

Appellants appeal from the January 31, 2003, order of the District Court denying their Rule 60 (b) motion, the May 13, 2003, order denying their recusal motion, and the June 5, 2003, order denying their motion to reconsider the January 31, 2003, order. For the reasons that follow, we will affirm.

The background and factual allegations underlying this cause of action are well known by the parties and need not be detailed here. Briefly, appellants' decedent, Daniel T. Cooney, Jr., consented to have Dr. Robert Booth perform knee replacement surgery. Dr. Arthur Bartolozzi assisted Dr. Booth. After the surgery, Cooney's foot became discolored and no pulses were palpable. Corrective vascular surgery was performed. Cooney died as a result of secondary complications from the vascular surgery.

Cooney's estate and individual family members (appellants in this case) filed suit against the doctors involved and a number of other medical personnel and entities. On March 8, 2001, the District Court granted summary judgment in favor of Dr. Bartolozzi.[1] Appellants then voluntarily dismissed all remaining defendants except Dr. Booth. On

---

[1] The same order also granted summary judgment in favor of defendant Nazarian.

2

6

March 22, 2001, a jury returned a verdict in favor of Dr. Booth. We affirmed.

In June 2002, appellants filed a Rule 60 (b) motion to set aside the order granting summary judgment in favor of Dr. Bartolozzi and the jury verdict in favor of Dr. Booth. In the motion, appellants asserted that the judgments should be set side because Dr. Booth and Dr. Bartolozzi committed fraud upon the court. The basis for the assertion of fraud was, inter alia, that appellants recently discovered that Dr. Booth's trial testimony conflicted with Dr. Bartolozzi's deposition testimony on the issue of whether Dr. Booth performed the critical aspects of Cooney's surgery. The District Court denied the motion, reasoning that it was untimely filed more than one year after the entry of the judgments, and that, even assuming that the motion was timely, it lacked merit.

Appellants subsequently filed a motion for reconsideration of the order denying their Rule 60 (b) motion along with a motion for recusal requesting that the District Judge recuse himself and vacate the order denying the Rule 60 (b) motion. The District Court denied the recusal motion by order entered May 13, 2003, and denied the reconsideration motion by order entered June 5, 2003. This appeal followed.

The District Court properly denied appellants' motions. We agree with the District Court that the Rule 60 (b) motion was untimely, see Fed. R. Civ. P. 60 (b), except for the allegation of fraud against the court, which we find to be without merit.

Despite appellants' assertions, Rule 60 does not provide a good cause exception for untimely filings and, even if it did, appellants' assertions fail to show good cause.

3

7

With respect to the order denying appellants' recusal motion, the District Court did not abuse its discretion in denying the motion. See Jones v. Pittsburgh Nat'l. Corp., 899 F.2d 1350, 1356 (3d Cir. 1990). Simply put, we find nothing in the record that suggests personal bias or prejudice by the District Court that would preclude fair judgment. See 28 U.S.C. § 144; U.S. v. Furst, 886 F.2d 558, 582 (3d Cir. 1989). Nor do we perceive any facts from which a reasonable person would conclude that the impartiality of the District Court might reasonably be questioned. See 28 U.S.C. § 455(a); Edelstein v. Wilentz, 812 F.2d 128 (3d Cir. 1987). To the extent that appellants challenged the District Judge's handling of certain motions, appellants should have pursued their concerns on direct appeal from the final order. Unfavorable rulings do not form an adequate basis for recusal. See SecuraComm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 278 (3d Cir. 2000).

The District Court likewise did not abuse its discretion in denying appellants' reconsideration motion. Appellants failed to show an intervening change in controlling law, new evidence, clear error of law or fact, or manifest injustice. See Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Consequently, their motion was properly denied.

We have considered all of appellants' arguments and find them unpersuasive. Accordingly, we will affirm the orders of the District Court.

4

*8*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELEANOR M. COONEY, AS             :      CIVIL ACTION
EXECUTRIX OF THE ESTATE OF        :      NO. 00-1124
DANIEL T. COONEY, JR.,            :
DECEASED, et al.,                 :
                                  :
        Plaintiff,                :
                                  :
    v.                            :
                                  :
ROBERT E. BOOTH, JR., MD.,        :      FILED  JAN 3 0 2003
et al.,                           :
                                  :
        Defendants.               :

ORDER

AND NOW, this 30th day of January, 2003, upon
consideration of the motion of plaintiff Eleanor Cooney et al. to
set aside judgment et seq. (doc. no. 110), the response of
defendant Robert E. Booth, Jr., et al. (doc. no. 112), the
memorandum of law by plaintiff Cooney et al. (doc. no. 116), the
response by defendant Booth et al. (doc no 117), and the reply
memorandum of plaintiff Cooney et al. (doc. no. 119), and after a
hearing, it is hereby ORDERED that the motion is DENIED.[1]

---

[1]    First, the motion to set aside the judgment is
untimely.  Under Rule 60(b)(3), a motion to set aside the
judgment on the basis of fraud shall be filed within one year of
the entry of the judgment.  Fed. R. Civ. P. 60(b)(3).  It is
undisputed that the instant motion was filed more than one year
from the entry of judgment.  Nor is petitioner entitled to
proceed under subsections (2) or (6) in that the basis for the
allegations in the motion, i.e., the conflict between the
testimony of Dr. Booth at trial and Dr. Bartolozzi at deposition,
was either known or should have been known to petitioner, since
petitioner had a transcript of Dr. Bartolozzi's deposition at the
time of trial.  See Fed. P. Civ. P. 60(b)(2) (newly discovered
evidence previously undiscoverable by due diligence); Fed. R.

ENTERED
JAN 3 1 2003
CLERK OF COURT

*Exhibit "E"*

9

AND IT IS SO ORDERED.

EDUARDO C. ROBRENO,  J.

Civ. P. 60(b)(6) (any other reason justifying relief).
Second, assuming that the motion is timely, it fails because petitioner cannot show the existence of fraud on the court, or the commission of perjury by Dr. Booth.  The gist of petitioner's claim is that Dr. Booth's trial testimony is in conflict with Dr. Bartolozzi's deposition testimony on the issue of whether Dr. Booth performed the critical aspects of Mr. Cooney's surgery. Assuming that this is so, an inconsistency between the testimony of two witnesses does not amount to fraud and is not proof of perjury.  See Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001) ("Conflicting or inconsistent testimony is insufficient to establish perjury."); Becker v. Cress, Nos. 92-36681, 93-35291, 1994 WL 142968, at **2 (9th Cir. Apr. 20, 1994) ("Inconsistent testimony by a witness is not the type of fraud upon the court that could reopen a judgment.").  Moreover, as stated above, at the time of trial, petitioner and trial counsel had in their possession Dr. Bartolozzi's deposition testimony.  Yet, petitioner and counsel, for reasons of trial strategy or as a result of counsel's error, forwent the opportunity either to confront Dr. Booth on this point while on the stand, or to call Dr. Bartolozzi as a trial witness (who was located within the subpoena power of the court).  Having forgone the opportunity at trial to place at issue Dr. Booth's contention that Dr. Bartolozzi was involved in critical aspects of Mr. Cooney's surgery, petitioner may not now collaterally impeach the jury's verdict.

Finally, petitioner raises serious issues concerning Dr. Booth's professional conduct in other matters unrelated to the treatment of Mr. Cooney.  The court by this decision offers no views on whether Dr. Booth's conduct, as alleged, may have run afoul of federal or state law, or any professional standards applicable to him.  These judgments are to be made, if at all, by appropriate authorities in other forums.

Upon review of the record, the court is left with the firm impression that petitioner received a fair and full hearing of her claims in this case at trial and on appeal.

10

# GRADUATE

PHILADELPHIA, PA 19146

OPERATING ROOM

## INTRAOPERATIVE RECORD

ADDRESSOGRAPH

DATE: 02-26-98    ROOM NUMBER: ___    77

IN ROOM: 1420    PROCEDURE START TIME: 1511

OUT OF ROOM: 1647    PROCEDURE END TIME: 1604

SURGEON: A. Bartolozzi MD    1ST ASSIST: D. McHughes    2ND ASSIST: ___

SURGEON: ___ DO    PA: ___    OTHER: D. Holmes O.T.

ANESTHESIOLOGIST: T. Quillias    CRNA: D. Schoemaeter    RESIDENT: ___

ANESTHETIC: ☐ GENERAL   ☐ MAC   ☒ REGIONAL   ☐ LOCAL

LOCAL AGENT: ___   AMOUNT: ___ cc.   LOCAL AGENT: ___   AMOUNT: ___ cc.

SCRUB NURSE: M. Pruskowski RN    CIRCULATING NURSE: R. Dennis RN

SCRUB RELIEF: L. Tootharian S.T. 1530    CIRCULATING RELIEF: N. Watkis RN 1530

SCRUB RELIEF: ___    CIRCULATING RELIEF: ___

PRE-OPERATIVE DIAGNOSIS: DJD. L knee

POST-OPERATIVE DIAGNOSIS: same

WOUND CLASSIFICATION (Check One Only): ☒ CLEAN I    ☐ CLEAN/CONTAMINATED II

☐ CONTAMINATED III    ☐ DIRTY IV

PROCEDURE #1: L T.K.A.

PROCEDURE #2: Foley catheter insertion - deactivation sphincter

PROCEDURE #3: ___

PROCEDURE #4: ___

VOLUME LOSS: ___ cc.

SPECIMENS: contents L knee

___

___

___

CULTURES/CYTOLOGY: ∅

IMPLANTS: ☐ N/A   ☒ INSERTION   ☐ REMOVAL   ☒ CEMENT   ☒ CARD FILED   ☐ AUTOCLAVE #___   LOAD #___

| TYPE | MANUFACTURER | SITE | SIZE | LOT/SERIAL # | CAT./MODEL # | EXP. DATE |
|------|--------------|------|------|--------------|--------------|-----------|
| Cement | Howmidica L knee | | 40gx2 | RLE558 | 6191-1-001 | 9/2000 |
| femoral | (Immex) | | 59 | 54415800 | 5200-02 | |
| tray | | | 59 | 54859200 | 5200-22 | |
| poly | | | 59x12 | 40655900 | 5220-22-03 | |
| Patella | | | 32 | 14880600 | 5220-17 | |

SERVICE:

| | | |
|---|---|---|
| PLA | ORT | |
| GYN | GEN VAS | |
| DEN | URO | |
| CT | COS | |
| OPT | POD | |
| NEU | ENT | |

COUNTS:

SHARPS:    ☒ CORRECT   ☐ INCORRECT

SPONGES: ☐ N/A   ☒ CORRECT   ☐ INCORRECT

INSTRUMENTS: ☐ N/A   ☐ CORRECT   ☐ INCORRECT

IF CORRECT, WAS X-RAY TAKEN:

☐ YES   ☒ NO

RESULT: ___

LASER: ☐ YES   ☒ NO

TYPE: ☐ CO₂   ☐ YAG   ☐ KTP

LASER NURSE: ___

MINUTES: ___

ENERGY: ___

LASER SAFETY PROTOCOL FOLLOWED

☐ YES   ☒ NO   IF NO EXPLAIN:

11

Attachment "G"    "Exhibit F"

**OR RN**

SAFETY STRAP SECURED  LOCATION: Chest   COMMENT: _____

BODY POSITION: ☐ JACK KNIFE  ☐ LATERAL  ☐ RIGHT  ☐ LEFT  ☐ GEORGIA PRONE  ☐ LITHOTOMY  ☐ PRONE  ☒ SUPINE
☐ SEMI-FOWLERS  ☐ SEMILATERAL  ☐ RIGHT  ☐ LEFT  ☐ OTHER: _____

POSITIONING DEVICES:   ☐ ALLEN STIRRUPS   ☐ LATERAL SUPPORT   ☐ KAMBIN'S FRAME   ☐ PILLOWS
☐ WILSON FRAME   ☒ CANDY CANE STIRRUPS   ☐ KIDNEY REST   ☐ TRENT ANDREWS FRAME   ☐ VAC PAC
☐ MAYFIELD FRAME   ☐ SHOULDER SUSPENSION   ☐ LEG REST PILLOW   ☐ BUMP  WHERE: _____
☒ OTHER: Foot Rest

ARM POSITION: ☒ RIGHT  ☐ ARMBOARD  ☐ AT SIDE  ☐ FOAM ARM REST  ☐ OTHER: _____
☒ LEFT  ☐ ARMBOARD  ☐ AT SIDE  ☐ FOAM ARM REST  ☐ OTHER: _____

EQUIPMENT USED:   ☐ N/A   ☐ NEUROSTAT   ☐ BLANKETROL #____@____°C   ☐ INSUFFLATOR
☐ CUSA____min   ☐ ORTHO PUMP   ☐ PHACO   ☐ SLUSH MACHINE   ☐ CYSTO EQUIP.
☐ MICROSCOPE   ☐ PORTABLE X-RAY   ☐ C-ARM   ☐ LAPROSCOPIC EQUIPMENT   ☐ DEFIBRILLATOR
☐ ANGIOSCOPE   ☐ ARTHROSCOP. EQUIP.   ☐ FX TABLE   ☐ ANTI-EMBOLIC PUMP   ☐ STERIS #____
☐ CAVITRON   ☐ FLASH AUTOCLAVE #____   ☒ OTHER: Both Power

☐ TOURNIQUET:
☐ PLACEMENT: Left Thigh   APPLIED BY: Miklich DO   MACHINE #: AE039017
☐ TIME UP: 1510   TIME DOWN: 1604   PRESSURE: 400 mmHg
☐ TIME UP: ____   TIME DOWN: ____   PRESSURE: ____
Stryker Org. Stryke Cema...

☐ ELECTROSURGICAL:
☐ BIPOLAR  ☒ MONOPOLAR  ESU #: 20A1302n  BIPOLAR #: ____  ABC #: ____
☐ PLATE __   PLACEMENT ℞ Thigh   LOT #: AE   EXPIRATION DATE: 2001 2
☐ SETTINGS:  COAG: 75  CUTTING: 25   SKIN CONDITION AFTER REMOVAL: ____
OTHER: ____

**OR RN**

GENERAL SKIN CONDITION:
PRE-OP: Spotted areas/abrasion arround body - bruised red + brown
POST-OP: same

SHAVE / PREP:  ☐ NO  ☐ YES            SURGICAL SITE PREPPED:  ☐ NO  ☐ YES
AREA: W leg                             AREA: W leg
SOLUTION: Wires                         SOLUTION: betadine / alcohol

MEDICATIONS: (DOSE/ROUTE/TIME/ADMINISTERED BY) _____

MEDICATED IRRIGANT (X2) 8 agent / 5000 bacitracin IN 1000 CC OF NS
DRAINS:  ☐ NO  ☐ YES - TYPE: Mediken oral   LOCATION: OR RN
TYPE: ____   LOCATION: ____
FOLEY CATHETER: ☐ NO  ☐ YES  16 FR. 10 CC BALLOON. INSERTED BY: Not Inserted
PACKING: ☐ NO  ☐ YES - TYPE: ____   LOCATION: ____
DRESSING: adaptic - 4x4 - weird   ☐ CAST - TYPE: ____

PT TO: ☐ PACU  ☐ ICU  ☐ ROOM  ☐ OTHER: ____   VIA: ☐ BED ☐ STRETCHER ☐ AMBULATING
NURSES NOTES: Pt arrive c CRNA Schwindu, warm blanket applied consent signed
free placement to a but for urology. PT to adaptic/sphygto. R Dennis RN
As per DOC request dadderin dressing applied to Chest R Dennis RN

| SIGNATURE | INITIALS | SIGNATURE |
|---|---|---|
| Rita Dennis RN CNOR | | |

OPERATIVE VISIT / EVALUATION: _____

12

**ALLEGHENY**
**UNIVERSITY HOSPITALS**
**GRADUATE**

**OPERATIVE REPORT**

One Graduate Plaza
1800 Lombard Street
Philadelphia, PA 19146
215.893.2000

PATIENT:      COONEY, DANIEL          DATE:   02/26/98
HISTORY NUMBER:    782873
SURGEON:      DRS. BARTOLOZZI/BOOTH
ASSISTANTS:

ANESTHESIA:      SPINAL EPIDURAL
ANESTHETIST:

---

PREOPERATIVE DIAGNOSIS:      Degenerative joint disease of left knee

POSTOPERATIVE DIAGNOSIS:      Same

PROCEDURE:      Left total knee arthroplasty

ESTIMATED BLOOD LOSS:      50 cc

TOURNIQUET TIME:      45 minutes

OPERATIVE PROCEDURE:      The patient was taken to the operating room and placed in the supine position after the adequate administration of anesthesia. The left knee was prepped and draped in the usual sterile fashion. The extremity was exsanguinated with an Esmarch bandage and the tourniquet was inflated.

A longitudinal midline incision and medial parapatellar arthrotomy were performed. The patella was everted laterally and advanced degenerative changes were seen. The cruciate ligaments were excised and soft tissue releases were performed to restore alignment of the limb. The tibia was subluxed anteriorly and a transverse tibial cut was performed. The tibia was provisionally sized for a 59 Zimmer Insall-Burstein II component. The femoral AP cut was then performed and a 59 x 12 mm block provided excellent stability in flexion. The distal femoral cut was performed with the assistance of a soft tissue tensor and a 59 x 12 mm block provided excellent stability in extension.

The chamfer cuts were performed and a provisional 59 femoral, 59 tibial, 59 x 12 mm tibial spacer, and 32 mm tripegged domical patellar button was placed. The knee was taken through a full range of motion with excellent alignment, stability and patellofemoral tracking. The provisional components were removed and the bone surfaces were further prepared with burrs and pulsatile cleansing. Pressurized cement was used to sequentially secure the femur, tibia, and patella. The knee was placed in full extension, the excess cement was removed and allowed to harden. The knee was reirrigated and closed sequentially over double drains using #1 vicryl capsular sutures, #2-0 vicryl subcutaneous sutures and skin staples. Sterile compression dressings were applied and the tourniquet was released.

The attending physician was present for the key portion of the

13

COONEY, DANIEL                    -2-

782873

procedure including the soft tissue balancing, bone preparation, and
prosthesis implantation and was immediately available throughout the
entire procedure.   The patient tolerated the procedure well and left
the operating room in excellent condition.


/TL132/1921
DD:02/26/98                              DRS. BARTOLOZZI/BOOTH
DT:02/27/98


/4



BOOTH BARTOLOZZI
BALDERSTON

Robert E. Booth, Jr., M.D.
Arthur R. Bartolozzi, M.D.
Richard A. Balderston, M.D.
Peter F. DeLuca, M.D.
Philip M. Maurer, M.D.
David G. Nazarian, M.D.



**ALLEGHENY**
UNIVERSITY HOSPITALS
GRADUATE

THE ORTHOPAEDIC HOSPITAL
Allegheny University Hospitals
Graduate

1500 Lombard Street
Philadelphia, PA 19146
215-893-2222
888-673-4532
215-893-6771 Fax
www.88Ortho.com

## REQUEST FOR MEDICAL AND SURGICAL PROCEDURES

### TOTAL JOINT REPLACEMENT CONSENT FORM

PATIENT: _Daniel Cooney_  AGE: _80_  DATE: _2|12|98_  TIME: _____ AM/PM

1) I hereby request and authorize Dr. _____ Booth/Bartolozzi/DeLuca/Nazarian and/or Associates and Assistants to perform upon me (or upon the above named patient), the following operation and/or medical procedures: (List specific nature of operation and procedures to be performed.)

_Left total Knee Aethroplasty_

2) I am aware that the practice of medicine and surgery is not an exact science and results cannot always be anticipated. I acknowledge that no guarantee or assurance has been given to me by anyone as to the results that may be obtained in the operation to be performed upon me and of any medical, surgical or therapeutic procedures in Allegheny University Hospitals, Graduate. I understand that complete restoration of function may not be achieved as a result of this operation or procedure.

3) The nature and purpose of this operation, possible alternative methods of treatment, the risks involved in the surgery and in the administration of anesthesia and the possibility of complications have been fully explained to me and I completely understand them. The significant risks and complications explained to me and which are involved in this procedure include, but are not limited to the following: INFECTION, PHLEBITIS, THROMBOEMBOLISM, SWELLING, DELAYED HEALING, ANESTHESIA RISKS PER ANESTHESIA, CARDIAC EVENT, STROKE, PERSISTENT PAIN, STIFFNESS, INSTABILITY, FRACTURE, NERVE INJURY, NUMBNESS, PARALYSIS, VASCULAR INJURY, BLEEDING, RECURRENCE OF DEFORMITY, LEG LENGTH INEQUALITY, WEAR, LOOSENING, DISLOCATION, AND DEATH.

4) I request the performance of operations and procedures in addition to or different from those now contemplated, whether or not arising from presently unforeseen conditions, which the above named doctor or his associates or assistants may consider necessary or advisable in the course of the operation.

5) I request the administration of such anesthetics as may be considered necessary or advisable by the physician responsible for this service.

15

_Attachment "5"    "Exhibit E"_

6) I consent to the photographing or televising of the operations or procedures to be performed, including appropriate portions of my body, for medical, scientific, or educational purposes, provided my identity is not revealed by the pictures or by descriptive texts accompanying them.

7) I hereby request and authorize Dr. _____ BBND _____ to retain, preserve, and use in grafts upon living persons or to otherwise dispose of the dismembered tissues, parts or organs taken from my body during hospitalization. I also authorize the necessary testing of such tissues, parts, or organs for communicable diseases, including the test for HIV (AIDS virus) antibodies. I understand the results of such testing will remain confidential.

8) This request form extends not only to the doctors to whom I have entrusted my care and others associated with or designated by them, but to Allegheny Graduate and its representatives, and in granting it I intend to assume the risk of possible unforeseen results and to be legally bound.

9) I certify that I have read and fully understand this request form which has been preceded by an explanation by my physician, that the explanations referred to were made by Dr. _____ BBND _____ and are understood by me and I agree not to revoke, limit or alter this request except in writing delivered to my physician prior to commencement of the operation procedure described herein.


_____
Signature of Physician

_____
Signature of Witness

_____
Signature of Patient

_____
Signature of Patient's Spouse, if available


When patient is a minor of incompetent to request:

_____
Signature of Person Authorized to Request for Patient


_____
Relationship to Patient

16

1  A. There was a -- according to the record,
2  there was injury to the intimal lining of the --
3  or an abnormality essentially in the intimal
4  lining of the artery.
5  Q. And do you know how that came about?
6  A. No.
7  Q. Did you review also any of the records with
8  respect to the vascular surgery that was
9  performed on Mr. Cooney in February '98?
10  A. Yes.
11  Q. Did you review the operative report of the
12  vascular surgery from Dr. Mantell?
13  A. Yes.
14  Q. Okay. You said you did not review the
15  arteriograms, the intraoperative arteriograms or
16  the presurgery arteriograms?
17  A. I did not.
18  Q. Okay. Did you, prior to Mr. Cooney's
19  orthopaedic surgery, the knee replacement, did
20  you see Mr. Cooney in your office before surgery?
21  A. I did not.
22  Q. Okay. Who was the physician in your office
23  who saw -- who saw Mr. Cooney before surgery?
24  A. He had seen both Dr. Booth and
25  Dr. Nazarian.

1  Q. Okay. Was he seeing Dr. Nazarian for the
2  anticipated knee replacement, do you know?
3  A. He had been treated by Dr. Nazarian for
4  another problem.
5  Q. Do you know what that problem was?
6  A. Yes. He had a hip revision surgery.
7  Q. Okay. And Dr. Nazarian was the surgeon in
8  that surgery?
9  A. As far as I know.
10  Q. Okay. Who was he seeing in your office
11  with respect to the anticipated knee replacement
12  or knee surgery?
13  A. I believe he seen Dr. Booth for that.
14  Q. Okay. But you didn't participate in any of
15  the examinations or treatment with respect to the
16  knee surgery?
17  A. No.
18  Q. When was the first time that you saw
19  Mr. Cooney?
20  A. The first time I encountered him was in the
21  operating area in Graduate Hospital.
22  Q. Okay. Before surgery, before his knee
23  replacement surgery?
24  A. Yes.
25  Q. Okay. Who was the surgeon for Mr. Cooney

1  for the replacement?
2       MR. O'BRIEN: Objection to the form.
3       THE WITNESS: Well, we operate as a
4  team with respect to the surgery. The procedure
5  involves a number of steps that are well
6  rehearsed and as part of the process, as a team,
7  we work together and take care of the patients.
8  The attending physician for Mr. Cooney was
9  Dr. Booth.
10  BY MR. KLEPP:
11  Q. What does it mean to be an attending
12  physician?
13  A. He primarily evaluated the patient ahead of
14  time, met with him, discussed the procedures and
15  is the attending with respect to that surgical
16  procedure.
17  Q. Is he, I think as Dr. Booth described, the
18  chorographer of the treatment in the surgical
19  procedure?
20       MR. O'BRIEN: Objection to the form.
21       THE WITNESS: Well, I don't know the
22  term "chorographer." We -- he is responsible for
23  certain aspects of the surgical procedure and we,
24  as a team, work together in concert to help
25  provide the patient with the best, you know, care

1  possible and each of us has different experiences
2  and expertise.
3  BY MR. KLEPP:
4  Q. Who would be the one ultimately responsible
5  for any decisions that would be made with respect
6  to the surgery of Mr. Cooney?
7       MR. O'BRIEN: At what point?
8       MR. KLEPP: During the procedure of
9  the surgery.
10       MR. O'BRIEN: Just at any time during
11  the surgery?
12  BY MR. KLEPP:
13  Q. Any time a decision has to be made with
14  respect to the surgery, who is the ultimate
15  responsible individual?
16  A. Dr. Booth is the -- anything that's out of
17  the ordinary or would require a decision such as
18  that would be Dr. Booth's decision.
19  Q. What parts of the surgery did you
20  participate in Mr. Cooney's surgery?
21  A. The initial part of the surgery involves
22  applying the drapes and the surgery involves
23  applying the drapes, establishing the surgical
24  field, making an exposure to the knee, beginning
25  the initial phases of the knee replacement,

17

**Page 17**

1  removing bony osteophytes and preparing the bones
2  themselves for the actual replacement procedure.
3  Q. That's the part that you participated in?
4  A. Yes.
5  Q. All right. Did anyone assist you or -- did
6  anyone assist you in performing those roles?
7  A. In this particular case, there was a --
8  typically, in this case, we had a resident who
9  was Dr. McHugh and there was a surgical assistant
10  as well who provides some assistance, a surgical
11  assistant or physician or a nurse.
12  Q. A doctor?
13  A. No.
14  Q. It's termed surgical assistant?
15  A. Yes.
16  Q. Who was the surgical assistant involved in
17  this case, if you know?
18  A. I don't recall.
19  Q. Is it in the operative report?
20  A. It may be.
21       MR. O'BRIEN: If you're looking for
22  the name, it's written somewhere. It's in the --
23  I believe it would be --
24  BY MR. KLEPP:
25  Q. Would it be -- I'm going to show you the

**Page 18**

1  intraoperative record. Is it reflected anywhere
2  on the intraoperative record?
3  A. Yes.
4  Q. And who is it?
5  A. D. Holmes.
6  Q. Okay. Thank you. Now, since we have the
7  operative record out, on the operative record,
8  also you're listed as the surgeon for Mr. Cooney,
9  do you see that, and there is another doctor
10  that's listed as the surgeon?
11  A. Yes.
12  Q. Who is the other doctor listed as the
13  surgeon?
14  A. Dr. McHugh.
15  Q. And then below your name, there's another
16  person listed as the surgeon.
17  A. I can't read the name, but it's --
18  Q. You can't read the name?
19  A. I'm not familiar with that.
20  Q. Okay. And, in effect, where you said
21  McHugh, is Dr. McHugh listed as first assistant?
22  A. Yes.
23  Q. Okay. Do you know why you were listed as
24  surgeon along with the other physician whose name
25  you cannot decipher?

**Page 19**

1  A. No.
2  Q. On the operative record on the line at the
3  top where "surgeon" is printed, both you and
4  Dr. Booth are listed as the surgeon; is that
5  correct?
6  A. Correct.
7  Q. Do you know why you and Dr. Booth are
8  listed as the surgeon on that record?
9  A. We were both involved in the surgery.
10  Q. Okay. Now, other than the procedure that
11  you've just described that you were involved in
12  with respect to Mr. Cooney's operation, were you
13  involved in any other part of Mr. Cooney's
14  operation?
15  A. I was involved at the end of the procedure
16  with the -- with the -- at the end of the
17  cementation or the part -- cementing of the
18  parts. The exposure and the area is irrigated
19  with an antibiotic liquid and then the wound is
20  closed. The deep tissues are closed and then the
21  skin is closed and then staples are applied.
22  Q. And were you involved in that procedure?
23  A. Yes.
24  Q. Was Dr. Booth involved in the operation?
25  A. His involvement is in soft tissue, ligament

**Page 20**

1  balancing, participating with the bony cuts,
2  application of trial prosthetic devices that are
3  the size of the devices that we'll ultimately use
4  and once the parts are applied and cemented,
5  he's -- that's the limit of his involvement.
6  Q. During any of your involvement in the
7  surgery, did you come in contact with the
8  popliteal artery of Mr. Cooney?
9  A. No, it's well out of the way of the field
10  and it's not a structure that we see or expose.
11  Q. Is there any risk in a knee replacement
12  surgery such as Mr. Cooney's to injure the
13  popliteal artery?
14  A. Yes.
15  Q. And what's the risk?
16  A. There are risks of vascular injury with
17  knee surgery. Vascular -- there is known
18  vascular complication or vascular injury that can
19  occur.
20  Q. What types of injury can occur?
21  A. Arterial lacerations can occur, dislodgment
22  of plaque lodged in an artery, a clot, thrombus
23  can occur.
24  Q. What's arterial laceration?
25  A. It's where an artery is lacerated.

18

1   Q    So you knew about it even as of the time of surgery?

2   A    Yes.

3              (Pause.)

4   Q    Now, on February 26th you went forward with the surgery

5   on Mr. Cooney; isn't that right?

6   A    Yes.

7   Q    Let's talk about the surgery.  Do you recall, sir, back

8   on April 28th, 1997, your meeting with Mr. Cooney, do you

9   recall him asking you words to the effect, Will you --

10  meaning you  Dr. Booth you -- perform or do the knee

11  replacement surgery on me?  Do you recall him saying words to

12  that effect to you?

13  A    He asked if we would do -- I would do a knee replacement

14  on him, yes.

15  Q    If you would?

16  A    Yes.

17  Q    And he had only met with you as of that moment?

18  A    Correct.

19  Q    And do you recall telling him words to the effect, Yes,

20  young man, I will do the surgery for you or on you?

21  A    Yes.

22  Q    So you promised him then that you would do the knee

23  replacement surgery, didn't you?

24  A    I told him that I would do --

25  Q    Did you promise him then that you would do the knee

1   replacement?  You understand the word "promise"?

2   A   Yes, I do.

3   Q   Did you promise him, at that time, that you would do the

4   knee replacement surgery?

5   A   Yes.

6   Q   You didn't tell him, at that time, anything about there

7   being a team approach to this, that I with other people are

8   going to be doing this on you and for you, did you?

9   A   Yes, I did, that's absolutely incorrect.

10  Q   You have a recollection of that?

11  A   It is only a recollection because that is what I tell

12  everybody that I see.  And I explained to you in direct

13  testimony exactly what it is I tell people.

14  Q   Now, Mr. Cooney was there for your personally to perform

15  that surgery, and he asked you whether you personally would

16  perform that surgery; is that --

17  A   He did not ask if I'd personally would perform the

18  surgery.  He asked if I would do his knee surgery and I said

19  yes.

20  Q   You don't understand that to be requesting that you do it

21  personally?

22  A   Nobody can do the operation by themselves, that is --

23  it's an inappropriate question -- and what I tell them, as

24  part of their informed consent, is that we work as a team,

25  there will be several doctors, my partners as well as

20

1        Art Bartolozzi is my sports partner, but he's very

2    good with soft tissues, and ligaments, and he takes care of

3    the pro teams.  There are a couple of the pro teams here in

4    Philadelphia, and he's very good, and he's taught me a lot

5    about soft tissue balancing.

6        The second level is that we teach fellows and

7    residents, so they're working and they're doing parts of this

8    surgery as well, we're a teaching hospital.  And so they need

9    to hear that, and that's all written on the consent forms as

10   well, but, you know, that's part of the way we work, and it's

11   one group that -- that covers the surgery and the after-care

12   together.

13   Q    Now, is Dr. Bartolozzi, the name that you mentioned, he

14   was one of the surgeons in the operating room with you and

15   Mr. Cooney?

16   A    Yes.

17   Q    Is he the team orthopedic physician for the Philadelphia

18   Eagles and the Philadelphia Flyers, both?

19   A    The Eagles, the Flyers, the Phantoms, the Kicks, he's

20   overcommitted to sports.

21   Q    Okay.  To the best of your recollection, when Mr. Cooney

22   and his daughter left on that April visit, were there any

23   questions, do you know, posed to you that went unanswered in

24   any way, shape, or form?

25   A    No, I think the only thing I didn't mention is we do say

1    "I hereby" -- which has your name written in -- "I hereby

2    request and authorize Dr." -- and it's not filled in.  It

3    says Booth, Bartolozzi, DeLuca, Nazarian.

4            Given that this is a total joint replacement consent

5    form, why is it that unlike the hip form over here, where

6    you're named on them, why is it not on this -- on this -- in

7    this case?

8    A    On the hip, what I was trying to take advantage of was

9    Dave Nazarian's specific expertise in doing these hip

10   conversions.  As I said, this is not a primary hip, this is a

11   conversion from a hip fracture, which is a slightly different

12   and more complicated operation, which he likes to do and does

13   very well.

14           The knee is something that we do interchangeably,

15   really three of us.  Dr. DeLuca really only does -- rarely

16   does total knees, but Dr. Bartolozzi, Dr. Nazarian, and I do

17   the total knees at our institution and we assist each other,

18   do them together, we work in this team fashion that I've

19   tried to explain earlier.

20           So what I want the patients to know, and what they

21   are, indeed, told is that we work as a team.  This is the

22   attending physicians, this is the staff doctors, this is not

23   the residents and fellows, this is my partners.  And that's

24   what this reflects (indicating).

25   Q    And do we know who started the procedure, who initiated

1  the surgical procedure on Mr. Cooney for this left total knee

2  arthroplasty?

3  A   Yes, Dr. Bartolozzi.

4  Q   Okay.  And was he assisted by anyone?

5  A   At the beginning by Dr. McHugh, who was a resident from

6  the Allegheny System -- the former Allegheny System.

7  Q   Okay.  And is there an operative note dictated pursuant

8  to this surgery -- strike that.

9          Is there an operative note dictated after the

10 surgery that was done on Mr. Cooney that day?

11 A   Subsequent to it, yes.

12 Q   Let me ask you why you, or Dr. Bartolozzi, or Dr. McHugh,

13 did this procedure on a man that is alleged to have

14 peripheral vascular disease sufficiently, allegedly, to

15 warrant an arteriogram or some type of study before the

16 surgery, coupled with an ulcer on the heel, what was it that

17 you found, in treating your patient, that makes you disagree

18 with the contentions that Mr. Klepp's witness was to put

19 forth?

20 A   That's a big question, so let me take it systematically.

21         Mr. Cooney -- and I'd like -- and there's been a lot

22  of talk for several days -- I personally believe Mr. Cooney

23 had peripheral vascular disease.  I believe that I have it,

24 Dr. Kendrick said you had it, probably all but two or three

25 people on this panel have it by virtue of age.  We change as

1 · basically a knee replacement.  It's a little more

2 complicated than that, but that's essentially --

3 Q    Now, given your training and -- incidentally, do you

4 teach surgeons this technique of knee replacement?

5 A    Yes.

6 Q    And do you write specifically on the -- when I say

7 "write," I mean do you write medically-recognized literature,

8 journals and the like on this specific procedure of knee

9 replacement?

10 A    Yes.

11 Q    In Mr. Cooney's surgery, what portion of Mr. Cooney's

12 knee surgery involved that procedure, which you've just

13 described for us?

14 A    That was what we did to Mr. Cooney.

15 Q    All right.  And how long does that take -- well,

16 generally speaking, how long did it take, if you know from

17 the records, with respect to Mr. Cooney for you to do that

18 which you just described for us in a couple of minutes?

19 A    That was about 45, 50 minutes.

20 Q    When you said that Dr. Bartolozzi, you told us earlier,

21 deals with soft tissue, what does that mean?

22 A    We sort of, among ourselves, surgeons among ourselves,

23 not my partners, distinguish between hard tissue and bone and

24 soft tissue which is the ligaments.  Repairing the cruciate

25 ligaments and other ligaments around the knee is -- is a

1   different art.  I don't -- I used to do that years ago, but I

2    don't do that too much anymore.  I'm more into the hard

3   tissue, the parts, the bones, et cetera.  But we learn from

4   each other.  We're not just teaching residents and other

5   doctors, and we actually design these operations for the

6   companies that sells these things around the world, but we

7   learn for ourselves, and so that's Dr. Bartolozzi's gift to

8   me over the years has been a better understanding of

9   balancing the soft tissues.

10             A lot of people when they do knees, especially in

11  this community, put them in and all they care about is

12  getting the parts on the bone correctly, but you can have the

13  parts on the bone and have a knee that's wobbly or giving out

14  because the ligaments aren't balanced properly.  So the best

15  total knees are those which not only have the parts properly

16  aligned on the bones, but also restore the soft tissue

17  balance, because as I said, the soft tissues, the ligaments,

18  tendons, and muscles, are what hold it all together and make

19  it move. And if that's not good, then even the most

20  attractive X-ray won't work as a -- as a proper knee.

21  Q    And I believe you said that Dr. Bartolozzi is involved in

22  sports medicine?

23  A    Yes.

24  Q    And deals with more of the tendons and that than you do?

25  A    Yes.