THE WITNESS: And this is a right leg not a left leg once again.

What's done in a total knee is to make a skin incision up the front, across the knee joint. There are several layers that are divided and opened, and the kneecap and the tendon, what's called the patellar tendon in the quadriceps muscle, our -- our word is everted, which means that we actually flip them over and off to the side like this. It's still attached, it's just turned upside down, so that you're looking directly into the knee (indicating).

We then -- this not only takes a lot of hands in the operating room, it may take a few more hands here, but we then strip the -- we make a cut down onto the bone and elevate the soft tissues gently around the side, back to the middle of the knee here, underneath this ligament. This is what's called the medial collateral ligament, this big thing that keeps the knee from wobbling. And we put one of these retractors under there like this, like a lever, so that we can see what we're doing, and also to protect the ligament. So that every time we do a step in a total knee, there is protection for the things that we care about that are in that area (indicating).

After that's done, the knee is flexed like this, some more soft tissue is taken away up top to expose the bone, and then, as you can see, the knee starts to come

forward a little bit, and these tissues, if they're there, are taken out. Now, Mr. Cooney wouldn't have had meniscus, because his was all worn away as we saw in the X-ray. And what's then done is that one of these retractors is then put into the back of the knee right over the ligament. And, again, someone holds that up top. There are actually six hands that are necessary to do a knee the way we do it. And so somebody called a hook holder or a retractor is standing up there and will grab this.

All right. There we go. I'm sorry.

The ligaments are taken out in the back with the retractor protecting everything. Remember I told you that the blood vessels run behind the knee, so all of this protects the back of the knee. And this is the point where I entered this case with Dr. -- so we then moved Dr. McHugh out of the way, and Dr. Bartolozzi and I used a guide to cut off the top of the bone with a saw, you actually cut off about a quarter to a half an inch of bone on the top of the tibia. We then measure it for size, we measure it to be sure it's lined up correctly and straight, and that -- that completes the work on the top of the tibia at that point (indicating).

Before we actually cut the bone off, however, what we have to do -- I may need another pair of hands here --

MR. O'BRIEN: May I, your Honor?

THE COURT: Yes, you may.

THE WITNESS: Why don't you just hold this thing up top for me.

MR. O'BRIEN: Here?

THE WITNESS: Yes, please.

Before we actually cut the bone, in order to protect everything in the back, because this is done with an open, with a free saw, let's call it an oscillating saw, we put in these other retractors around the back of the knee like that and like that. And these are called self-retaining retractors. They sort of sit there by themselves, but what you can see in the back of the knee is that they also protect where the nerves and blood vessels would be, they're back here, so there's this bar, if you will, its primary function is to -- is to pull the lower leg forward so we can work on it, but it also prevents you from pushing anything back into the back of the knee, and then there are additionally these two metal bands back there, so it's practically impossible -- practically impossible to get a saw back there to hit anything behind the knee (indicating).

A piece of bone is taken off, these are taken out, and then we begin working -- thank you -- on the top of the knee. Here what we do apply a -- a jig, a cutting guide, that's a gadget that sort of captures the end of the femur and we -- some of them have slots in them, they're a variety of styles, but most of the time it just has -- it's a metal

block that tells us how much bone to cut off the top, the front and the back of the knee. We put in a metal block to see what the distance is because we then have to make sure that the ligaments are tight. Your natural knee, as well a total knee, should be secure in flexion, which is this position like you're sitting right now, and also out on extension. So we first cut that inflexion (indicating).

We then put in a gadget called a tensor, which is a pair of paddles, blunt paddles, that have a little screw drive on them that can stretch the ligaments. So we stretch the knee out in extension and whatever amount of bone we had cut off of these two sides, we then cut an identical amount of bone off the end of the femur. That's done again with a saw, again with tools protecting the soft tissues. We take away those pieces of bone, test it to be sure that it's correct. We have an additional tool we have to put on the front because there are -- in order to make the -- the femur fit, which is now sort of a box, there are these little levels or chamfers (ph) that we have to cut, that's also with a saw and that's done by -- it takes four hands; two people to do that. And then we apply trial parts, trial components (indicating).

There are -- there's an enormous range of variation in human anatomy. There are basically seven different femurs, seven different tibias, and many of them can be mixed

very sensitive to room temperature and we keep the rooms very cold, we operate in rooms that around 65 degrees for a variety of reasons, but one of them is that that constant temperature allows us to predict how long the cement will take to set. So once it's obvious that these okay, this is a very simple step, they're already mixing the cement at that point (indicating).

What we do is take these parts out, wash off the bone to open up all the little pores in it, and wash the fat, and if there is any blood out, but there's usually no bleeding because of the tourniquet around the thigh. We wash all that out and just put the cement on. It's like putting toothpaste on your brush in the morning, it's pretty simple, it comes out of a caulking gun. Put the parts on, put the knee out straight, and that's the point where I left the operation, as those parts were being put on (indicating).

What's happened then at the end is that somebody just sews up the capsule and then the skin, each of which takes 10 minutes or so.

Q Doctor, you heard some -- did you hear a discussion, during the course of this trial, with respect to some literature that you had co-authored?

A Yes.

Q Did you hear Dr. Kendrick, I believe it was, read to the jury one sentence of an article which you co-authored?

Q Well, did you help -- you did not help close Mr. Cooney case, did you?

A No, I did not.

Q Therefore, you did not take or push Mr. Cooney into recovery room?

A No.

Q Okay. You remained in the operating room then attending other patients?

A Until some later time, yes.

Q Did you see Mr. Cooney in the recovery room?

A Yes.

Q And did you see him immediately after the knee replacement surgery?

A It depends on what you mean by "immediately," as I previously --

Q How soon after the surgery did you see him?

A I would have seen him within an hour, roughly an hour.

MR. KLEPP: Thank you, Dr. Booth.

THE COURT: Redirect?

MR. O'BRIEN: Yes, your Honor.

Your Honor, I would like to mark, if I may, D-55, which for identification for the record, is the anesthesia record --

THE COURT: Well, okay. Well, show him D-55, and then ask the witness if he can tell us what it is, if he

Q What is it?

A That is a progress note from Graduate Hospital for Mr. Cooney's surgery.

Q The knee replacement surgery?

A Yes.

Q And does that document reflect the name of the surgeon?

A Yes.

Q Who is it?

A The name listed here is Dr. Bartolozzi, first assistant Dr. McHugh.

Q Okay. Your operative report, Doctor, for that surgery --

MR. KLEPP: I'm sorry, your Honor, move P-2 that has been identified by Dr. Booth into evidence.

THE COURT: Well, P-2, I thought it was in evidence.

MR. KLEPP: Maybe it has been marked and I don't recall.

MR. O'BRIEN: I have no objection to admitting it, your Honor.

THE COURT: Okay. Well, it's admitted without objection.

(Exhibit P-2D was admitted.)

MR. KLEPP: Okay.

BY MR. KLEPP:

Q The operative report, sir, for that surgery, it's a two-page document, isn't it --

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELEANOR M. COONEY, As Executrix of the Estate of Daniel T. Cooney, Jr., Deceased, and ELEANOR M. COONEY MULLER, DANIEL T. COONEY, III and ROBERT COONEY, individually<br>v.<br>ROBERT E. BOOTH, JR., M.D. ARTHUR R. BARTOLOZZI, M.D., DAVID McHUGH, D.O. (fictitious first name), DAVID G. NAZARIAN, M.D., JOHN DOE, M.D.(fictitious first name), BOOTH, BARTOLOZZI, BALDERSON, PENN, ORTHOPAEDICS, Corporation, MARK MANTELL, M.D., RECOVERY ROOM STAFF, JANE DOE, JOHN DOE, ET AL (fictitious fist name) GRADUATE HOSPITAL (formally Allegheny Graduate Hospital), PENNSYLVANIA HOSPITAL, and ROBERT E. BOOTH, JR., M.D. and MARK MANTELL, M.D., personally. | CIVIL ACTION NO:<br><br>00CV 1124<br><br>JURY TRIAL DEMANDED |

MOTION OF DEFENDANTS,
ROBERT E. BOOTH, JR., M.D., ARTHUR R. BARTOLOZZI, M.D.,
DAVID NAZARIAN, M.D. AND 3B ORTHOPAEDICS, P.C. TO PRECLUDE
ANY REFERENCE TO MEDICARE FRAUD AT TRIAL

Defendants, Robert R. Booth, Jr., M.D., Arthur Bartolozzi, M.D., David Nazarian, M.D. and 3B Orthopaedics, P.C., by and through their counsel, O'Brien & Ryan, LLP, hereby move this Honorable Court by way of Motion to Preclude and in support thereof aver as follows:

1. On or about November 1, 1999, plaintiffs instituted suit against defendants.

2. Discovery began, and defendants took the depositions of Eleanor Cooney and Helen Cooney Mueller.

32

3.     During those depositions, the deponents testified that they had heard that defendant, Dr. Booth, was being investigated for Medicare Fraud.

4.     Any reference to any Medicare investigation is irrelevant and should be precluded.

5.     Moreover, any possible probative value is clearly substantially outweighed by the prejudicial effect of such testimony.

6.     Indeed, this testimony is intended only to divert the jury's attention and engender distrust.

7.     Therefore, this Honorable Court should preclude any and all references to Medicare fraud, as they are irrelevant and offered solely to divert the jury's attention.

WHEREFORE, for all the foregoing reasons, moving defendants respectfully request this Honorable Court preclude plaintiff from introducing any references to Medicare fraud at trial.

Respectfully submitted,

O'BRIEN & RYAN, L.L.P.

JOHN F. O'BRIEN, III
Identification No. 32222
HEATHER E. HANSEN
Identification No. 80199
PAUL E. PEEL
Identification No. 76931
Suite 300, Hickory Pointe
Plymouth Meeting, PA 19462
(610) 834-8800
Attorneys for Defendants,
Robert E. Booth, Jr., M.D., Arthur R.
Bartolozzi, M.D., David G. Nazarian,
M.D., and 3B Orthopaedics, P.C.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELEANOR M. COONEY, As Executrix of the Estate of Daniel T. Cooney, Jr., Deceased, and ELEANOR M. COONEY MULLER, DANIEL T. COONEY, III and ROBERT COONEY, individually<br>v.<br>ROBERT E. BOOTH, JR., M.D. ARTHUR R. BARTOLOZZI, M.D., DAVID McHUGH, D.O. (fictitious first name), DAVID G. NAZARIAN, M.D., JOHN DOE, M.D.(fictitious first name), BOOTH, BARTOLOZZI, BALDERSON, PENN. ORTHOPAEDICS, Corporation, MARK MANTELL, M.D., RECOVERY ROOM STAFF, JANE DOE, JOHN DOE, ET AL (fictitious fist name) GRADUATE HOSPITAL (formally Allegheny Graduate Hospital), PENNSYLVANIA HOSPITAL, and ROBERT E. BOOTH, JR., M.D. and MARK MANTELL, M.D., personally. | CIVIL ACTION NO:<br>00CV 1124<br><br>JURY TRIAL DEMANDED |

MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS, ROBERT E. BOOTH, JR., M.D., ARTHUR BARTOLOZZI, M.D., DAVID NAZARIAN, M.D. AND 3B ORTHOPAEDICS, P.C., TO PRECLUDE ANY REFERENCE TO MEDICARE FRAUD AT TRIAL

I. FACTS

On or about November 1, 1999, plaintiffs, instituted suit against defendants. Over the course of discovery defendants took depositions of Eleanor Cooney and Helen Cooney Mueller. These witnesses testified regarding information they received that Dr. Booth was being investigated for Medicare Fraud. Any such testimony is clearly irrelevant and should be precluded.

This testimony is intended only to divert the jury's attention and therefore, it should be precluded.

## II. LAW AND ARGUMENT

Federal Rule of Evidence 401 reads "relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moreover, Rule 403 provides: although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

Clearly, the allegations that moving defendants seek to preclude do not meet the definition of relevance. However, even if these allegations were relevant, the prejudice inherent in these allegations clearly and substantially overbalances any probative force of those allegations. As such, these irrelevant allegations should be precluded at trial.

## III. CONCLUSION

Accordingly, this Honorable Court should preclude any and all references to Medicare fraud, as they are irrelevant and offered solely to divert the jury's attention.

WHEREFORE, for all the foregoing reasons, moving defendants respectfully request this Honorable Court preclude plaintiff from introducing any such evidence.

Respectfully submitted,

O'BRIEN & RYAN, L.L.P.

JOHN F. O'BRIEN, III
Identification No. 32222
HEATHER E. HANSEN
Identification No. 80199
PAUL E. PEEL
Identification No. 76931
Suite 300, Hickory Pointe
Plymouth Meeting, PA 19462
(610) 834-8800
Attorneys for Defendants,
Robert E. Booth, Jr., M.D., Arthur R. Bartolozzi, M.D., David G. Nazarian, M.D., and 3B Orthopaedics, P.C.

MR. CURRIER: Yeah.

MR. KLEPP: That's that one.

MR. CURRIER: Yeah.

MR. KLEPP: All right. But at any rate we have them here.

BY MR. KLEPP:

Q. These two notes, one dated 2/28/98 -- well, I'm going to hand them to you and you tell me because I'm not sure that I'm reading the dates right. The two exhibits that I've just handed you, and I'll have them marked in a second, are they documents which have notes authored by you?

A. Yes.

Q. All right. There appear to be on each of those sheets two sets of handwriting. At the top handwriting or the top note on each sheet, are they your notes?

A. Yes, they are.

Q. What's the date of those notes?

A. 2/26/98.

Q. For both of them?

A. Yes.

MR. CURRIER: Did you want to mark those?

MR. KLEPP: Yes, please.

BY MR. KLEPP:

Q. Does one precede the other? Can you put them in sequence for me?

A. Yes, one noted as an op note on 2/26/98 is the first note. And the one noted orthopedic post-op 2/26/98 is the second note.

MR. KLEPP: May I have them so we can have them marked, please? Thank you.

May I have them marked McHugh-1 and 2, please.

(Exhibit McHugh-1, progress note, 2/26/98, is marked for identification.)

(Exhibit McHugh-2, orthopedic post-op note, 2/26/98, is marked for identification.)

BY MR. KLEPP:

Q. Can you read for me then, Dr. McHugh, the op note dated 2/26/98?

A. Op note 2/26/98, pre-op diagnosis, DJD left knee.

Q. DJD stands --

A. Degenerative joint disorder. Post-op diagnosis, same; procedure, total knee arthroplasty, left; surgeon, Bartolozzi; first, McHugh.

Q. What does first mean?

A. First assist.

Q. Okay.

A. Anesthesia, spinal. Tourniquet time, 54 minutes at four hundred millimeters of mercury.

Q. When you read tourniquet time I see -- two T's, okay, tourniquet time.

A. Urine output, zero; fluid resuscitation, 12 hundred cc's normal saline, one unit of packed red blood cells; complications, zero; to recovery room, stable.

Q. Now, with respect to this note you do show Dr. Bartolozzi as the surgeon,

A. Yes.

Q. How did you determine that? How did you know that?

A. The way I write notes is whoever the first attending orthopedic surgeon is that starts the case with me is the one I put down as the...

Q. Did you work with any other surgeons that day other than Dr. Bartolozzi?

A. I don't recall.

Q. Do you recall -- having read that note do you recall working with respect to this patient with Dr. Booth --

A. I don't recall.

Q. -- during surgery?

A. I don't recall.

Q. Do you have a recollection today of having seen Dr. Booth during the course of Mr. Cooney's surgery on the 26th of February?

A. I don't recall.

Q. Have you served in the past as first assist in surgery with Dr. Booth on other patients?

A. Yes.

Q. Do you recall any other physicians involved in the surgery of Mr. Cooney on the 26th other than Dr. Bartolozzi?

A. I don't remember.

Q. You reflect the complications were negative, that there were no complications. How did you make that determination?

A. During the procedure if either anesthesia determines there's something wrong with the hemodynamic stability of the patient or if the attending orthopedic surgeon determines that something went awry during the procedure that's noted as a complication.

Q. Do you examine the surgical site during or after surgery in order to determine yourself whether there are any complications as a result

of the surgery?
A. During the procedure, no. It's totally up to the attending orthopedic surgeon. Postoperatively, during the postoperative visit the night of surgery the exam is performed with the attending there.
Q. Do you have a recollection of examining Mr. Cooney in the operating room after the surgery in order to determine whether there were any complications?
A. I don't recall.
MR. KLEPP: Now, can I have this marked as McHugh-3. This is the intraoperative record dated 2/26/98.
(Exhibit McHugh-3, intraoperative record, 2/26/98, is marked for identification.)
BY MR. KLEPP:
Q. Dr. McHugh, take a look at the intraoperative record, please, dated 2/26/98. Do you recognize that as the intraoperative record of the hospital with respect to the total knee arthroplasty of Mr. Cooney?
A. It looks like an intraoperative record. I'm not sure if it's his.
Q. Do you have a recollection in this instance

who prepared the intraoperative record?
A. No.
Q. Do you know from your experience at the hospital and in the operating room whose responsibility it is to prepare the intraoperative record at Graduate Hospital?
A. The circulating nurse.
Q. And there you are listed as first assist in surgeon?
A. Yes.
Q. To Dr. Bartolozzi as the surgeon?
A. Yes.
Q. Your postoperative note that's been marked as McHugh-2, would you read for us what's contained in that note?
A. Ortho post-op 2/26/98, patient seen in angio suite with general surgery. Foot still cold and mottled; positive anterior hallucis longus; positive tibial anterior; positive sensation; angiogram shows new clot or thrombus at the level of the popliteal artery with no flow past that level. To O.R. tonight for thrombectomy.
Q. When you refer to a clot or a thrombus what were you referring to or looking at, any document or record, that revealed that?

A. I don't recall looking at anything. Being there with general surgery it would be general surgery's interpretation of the angiography.
Q. Then where did you get the information that you put in the note that there was a clot or a thrombus?
A. I don't recall exactly, but the fact that I wrote with general surgery is more than likely from the circulating -- vascular, slash, general surgeon.
Q. And do you know who that was in this instance?
A. I believe it was Dr. Mantell.
Q. And did you have a conversation with Dr. Mantell with respect to this patient?
A. I don't recall.
Q. Did you do an examination yourself of this patient?
A. Yes.
Q. And how did you examine him?
A. By my note it shows that I visually and physically inspected him. Visually it showed that his foot was cold and mottled upon physical examination. He still had motor and good sensation to the lower aspects of his feet.

Q. What do you mean by mottled?
A. The color. There's a discolorization to the lower extremity where there's a venous stasis that gives it specific color, a mottled color, to the extremity.
Q. Do you know what time on the 26th you would have conducted your examination of Mr. Cooney?
A. No, I do not.
Q. Can you tell us in relation to the time that surgery ended how much time might have passed before you examined him visually and physically?
A. I don't -- I couldn't recall.
Q. Do you know from your review of any of the hospital records whether there would be any notes in the record that would reflect that, when -- the time that you examined him?
A. Not that I know of.
Q. And take a look at McHugh-3 again, which is the intraoperative record. If Mr. Cooney had been taken out of the operating room at 1647, which would be 4:47 p.m. that day, can you, based on that information, give any type of a realistic estimate as to when you may have seen Mr. Cooney and made the determination that you put in your note?

A. I couldn't tell you. The note's not timed so I couldn't -- I would be just totally guessing.
Q. Do you have a recollection whether you saw Mr. Cooney with anyone else from Dr. Booth's or Dr. Bartolozzi's staff?
A. No, I don't recall.
Q. Were you involved in the placement and monitoring of the tourniquet on Mr. Cooney during the course of the surgery, the total knee arthroplasty surgery?
A. Yes.
Q. And if you take a look at page two of McHugh-3, I believe that those are notes with respect to the tourniquet application. Am I right?
A. Yes.
Q. Did you take part -- physically I mean now -- take part in any other aspect of the surgery, opening the knee, any of the placement of the prosthesis, any of the cementing of the prosthesis, any of the cutting of the femur or tibia? Were you involved physically in any of those aspects of the surgery?
A. None that you just named, no.

Q. What aspects of the surgery did you take part in other than tourniquet?
A. Retraction, holding retractors and assisting in closing the wound.
Q. Holding retractors, what do you do when you hold retractors with respect to Mr. Cooney? Do you recall that? Do you recall --
A. I don't recall specifics of Mr. Cooney, no.
Q. Have you been involved in total knee arthroplasty of the type that Mr. Cooney had performed on him before Mr. Cooney's surgery?
A. Yes.
Q. All right. And had you taken part and been involved in the retractors in those surgeries?
A. Yes.
Q. What did you do in those surgeries with respect to the retractors? In other words, explain that to me.
A. Protocol is the attending surgeon would make a cut, would resect the tissue, place a retractor, and then the assistant would hold it there to hold soft tissue out of the way to expose the bone so that he could make the cuts.
Q. That's the purpose of the retractor, to retain the soft tissue from the surgical site?

A. Yes.
Q. Where in this type of surgery then in relation to the left knee are the retractors placed?
A. There's multiple different retractors used at different stages.
Q. And were you responsible for monitoring those retractors at each of the stages?
A. For holding the retractors in place, yes.
Q. Explain to me then how the retractor works in retaining or holding back the tissue from the surgical site. How does that work?
A. I don't think I understand your question.
Q. You have a retractor.
A. Okay.
Q. And there's going to be surgery and the cut is made. What -- physically what are the mechanics of the placement of the retractor so that it will hold or retain back the soft tissue?
A. Almost all retractors have somewhat of a double curve to it, so they're placed against part of the bone and then you cantilever the soft tissue away to expose the bone.
Q. Excuse me. I didn't mean to cut you off.
A. And then just when you hold them off you're

holding soft tissue out of the way.
Q. And do you have to physically hold them or is there some other device that will hold them back other than an assistant surgeon or a nurse or someone?
A. In a total knee arthroplasty it's an assistant physically has to hold them.
Q. Are any of the retractors placed in proximity to the popliteal artery of the knee?
A. There is one that is, yes.
Q. And in your experience in these surgeries does the retractor come in contact with the popliteal?
A. No.
Q. How close can you tell us in proximity to that artery will the retractor come?
A. I don't know specifics, but I would say within two centimeters.
Q. And is that then in your estimation or to your knowledge the proper position then for that particular retractor at that point in surgery?
A. Yes.
MR. KLEPP: Now, can I have this marked McHugh-4. This is the operative note of 2/26.

(Exhibit McHugh-4, operative note, 2/26/98, is marked for identification.)

BY MR. KLEPP:

Q. Dr. McHugh, this is what's been marked McHugh-4. That I understand to be the operative note of February 26th, 1998, regarding the left total knee arthroplasty of -- for Daniel Cooney. Do you recognize it as being that as well?

A. That's what it looks like, yes.

Q. In the second and third paragraphs there are several surgical procedures that are described, longitudinal midline incision and a medial parapatellar arthrotomy being performed, and so on. There are several -- that patella was everted laterally. Cruciate ligaments were excised. Did you have any direct involvement in the performance of any of those surgical procedures?

A. No.

Q. To your knowledge who was the surgeon then who had direct involvement with respect to the surgery on Mr. Cooney?

A. I don't recall.

Q. Well, do you recall Dr. Bartolozzi as the surgeon performing any of these procedures?

A. As I stated earlier I don't remember this specific procedure, so I can't say with certainty who did what in the procedure.

Q. In your experience would it be the surgeon who would perform these procedures?

MS. HANSEN: Objection to form.

THE WITNESS: Can you elaborate on the question? When you say the surgeon, do you mean Dr. Bartolozzi?

MR. CURRIER: You mean as opposed to him, the resident?

MR. KLEPP: Well, he's already said that he had no involvement in any of these procedures.

BY MR. KLEPP:

Q. What I'm trying to define now, who did -- and you have no specific recollection of this surgery.

A. Yes.

Q. All right. And I understand that. So now I'm trying to work sort of backwards and working from your experience or looking at your experience in these surgeries. Do you recall -- let me work at it a different way.

Do you have any recollection of anyone

other than Dr. Bartolozzi being involved in the surgery or being the surgeon with respect to Daniel Cooney --

MS. HANSEN: Objection to form.

BY MR. KLEPP:

Q. -- on the 26th?

MR. CURRIER: Objection. I think he's already answered he doesn't remember who the surgeon was, so I object to the form of that.

BY MR. KLEPP:

Q. But you can answer the question.

A. I don't remember specifics of that case. I don't remember if Dr. Bartolozzi was the one who performed those specific steps in that procedure.

Q. But you do see that Dr. Bartolozzi is the individual listed on the intraoperative report as the surgeon.

A. Yes.

Q. Is that correct? Okay. On the operative report you have as surgeons listed Dr. Bartolozzi, slash, Booth.

A. Um-hum.

MR. CURRIER: Objection to the form. You have --

MR. KLEPP: I don't mean --

MR. CURRIER: I don't think he prepared this.

MR. KLEPP: I mean he has it in the prepared report. That's the context in which it's meant.

BY MR. KLEPP:

Q. The operative report reflects Dr. Bartolozzi -- yes, Drs. Bartolozzi, slash, Booth. Looking at that report what does that tell you the case of Bartolozzi and Booth as the surgeons?

A. That would imply that Dr. Booth was in the room at some point during the procedure.

Q. In the room.

A. Yes.

Q. But you have no recollection of Dr. Booth being in the room during this procedure.

MS. HANSEN: Objection.

THE WITNESS: I don't recollect any of the procedure.

BY MR. KLEPP:

Q. Are there any other notes in the record of Graduate Hospital regarding Daniel Cooney that you either wrote or participated in the writing? And by participating in the writing I mean provide information to the writer of the note.

A. To what I've been supplied by my attorney, none.
Q. Have you reviewed the entire hospital chart?
A. No.
Q. Do you think that that would be advantageous to you to review that in order to answer that question?
A. For me to fully answer that question I would have to review the entire chart.
Q. Well, this is the part of the chart I will represent to you that includes the surgery and the immediate post surgery procedures, postoperative procedures, and then it goes onto the vascular surgery and other aspects of the hospitalization and treatment of Mr. Cooney. Take a look.
MR. CURRIER: Can we go off the record for a second?
MR. KLEPP: Sure.
(Off-the-record discussion.)
MR. KLEPP: Let's go back on the record then.
BY MR. KLEPP:
Q. I understand, Dr. McHugh, that there may be some confusion with respect to my question and

let's clear that up. At any time since the initiation of this litigation or since the surgery of Mr. Cooney have you had an opportunity to go through and review portions of the record that relate to your involvement --
A. Yes.
Q. -- with regard to that patient?
MR. CURRIER: Let him finish the questions.
MR. KLEPP: With respect to that patient.
THE WITNESS: Yes.
BY MR. KLEPP:
Q. And are you satisfied having conducted that review -- and did you conduct that review with your attorney?
A. Yes.
Q. Okay. Are you satisfied having conducted that review with your attorney that the only notes that you were directly involved in are the two that we have -- and that you have written are the two that we identified as McHugh-1 and 2?
A. Yes.
Q. That you've already seen this afternoon.
A. Yes.

Q. Are you also satisfied having conducted that review that they are also the only notes that you had any participation in other than writing? And that's a little unclear. You wrote those two. Are you satisfied that there are no other notes that exist in the record that you reviewed that reflect any of your participation in the surgery?
A. Yes.
MR. CURRIER: And of course that would be other than, Fred, we did look at the intraoperative note that did reflect his involvement with the tourniquets.
MR. KLEPP: Right.
MR. CURRIER: Other than that.
BY MR. KLEPP:
Q. When you saw Mr. Cooney and wrote your note, McHugh-2, in your post -- your postoperative note and wrote down your findings do you recall whether you brought those findings to anyone's attention, either in Dr. Booth's staff or any other doctor at Graduate Hospital?
A. I don't recall.
Q. Do you have a recollection and can you tell us with some degree of accuracy the number of knee replacement surgeries as of February 1998

that you had been involved in with any members of Dr. Booth/Bartolozzi's office?
A. I'd have to calculate it out. On an average I work with Dr. Booth two days a week for four months. On an average I would scrub about four or five total joints a day.
Q. When you say you worked with Dr. Booth, does that mean exclusively with Dr. Booth or are you talking about Dr. Booth's staff, Dr. Bartolozzi, Dr. Balderstein (sic), Dr. Nazarian?
A. As I stated earlier usually -- in the beginning of each surgical day you get assigned to a specific room and there were times when you needed to float to different rooms and there were exceptions where I did work with other surgeons, but the majority of my time at Graduate Hospital I would scrub in with Dr. Booth's primary rooms.
Q. Let me see if I understand that then. Does Dr. Booth have a primary room within which or in which he performed surgery at the time that you were associated with him?
A. Yes.
Q. Did Dr. Bartolozzi have a primary room where he performed surgery?
A. They were rooms that Dr. Bartolozzi was the

attending surgeon starting the procedure in specific rooms, yes.
Q. What does that mean, the attending surgeon starting the procedure? What do you mean by that?
A. Patients that came in that were going to have surgery for Dr. Booth for the most -- Dr. Booth would perform the key parts of the procedures, so if Dr. Booth had a primary room and you were the resident in his room he started the case with you. He would do the key parts of the procedure with you and if there was -- you were doing a closure Dr. Booth may leave the operating room to go to another operating room to get involved in a total joint that was already in progress.
Q. Do you have a recollection -- let me put it this way. Based on what you've told me already you have no recollection I would assume then of that procedure, that is, someone starting Mr. Cooney's surgery and then Dr. Booth coming in to perform the other aspects of the surgery. You have no recollection of that happening in this instance.
A. No, I don't.

Q. Based on your experience with Dr. Booth and his staff with respect to total knee replacement was it common or uncommon for someone other than Dr. Booth to begin the surgery and then Dr. Booth come in to perform his portion of the surgery?
MS. HANSEN: Objection to form.
BY MR. KLEPP:
Q. Whatever portion that might be.
A. That was -- at Graduate Hospital when I was rotating with Dr. Booth that was a common procedure.
Q. And so that we understand what you mean by common and we just don't leave it as a general term, can you define common? Maybe perhaps in terms of percentages of surgeries that were performed for that type.
A. Specific numbers I'm not sure.
Q. All right. If you can give me an educated...
A. Maybe 60 percent of the cases of Dr. Booth that were done under Dr. Booth's supervision were started by another attending physician.
Q. Now, I understand that shortly after the surgery your residency had been completed or completed?

A. My rotation with Dr. Booth ended the next day.
Q. And how soon after the surgery, do you recall?
A. The next day I was off service.
Q. And where did you go? What other field or aspect of your training did you go into?
A. My next rotation was in trauma down at Crozer-Chester Medical Center.
Q. Since that time, since the end of that particular rotation with Dr. Booth, have you gone back into the specialty of surgery or orthopedic surgery?
A. Yes.
Q. And is that going to be the discipline in which you practice when you conclude your residency?
A. Yes.
Q. Have you spoken to anyone -- have you spoken to Dr. Booth about joining his practice?
A. No.
Q. Do you intend to?
A. No.
Q. Are you going to practice in the city of Philadelphia?

A. I don't know.
Q. Is Philadelphia your home?
A. Yes.
Q. Have you had occasion since Mr. Cooney's surgery to speak to Dr. Booth about Mr. Cooney?
A. No.
Q. Have you had occasion to speak to Dr. Bartolozzi about Mr. Cooney since Mr. Cooney's surgery?
A. No.
Q. Have you spoken to anyone from Dr. Booth, Bartolozzi, Balderson's office regarding Mr. Cooney?
A. No.
Q. At any time thereafter since the surgery?
A. No.
Q. And that would include even time in terms of this litigation and your deposition.
A. No.
Q. Have you spoken to attorneys representing Dr. Bartolozzi or Dr. Booth or Dr. Nazarian in this litigation?
A. No.
Q. Have we covered, Dr. McHugh, the extent of your knowledge of Mr. Cooney's surgery and the

extent of your knowledge of your involvement in it?

A. Yes.

Q. Anything that you know of with respect to Mr. Cooney, his surgery or anything that occurred to Mr. Cooney that we haven't covered?

A. Not to my knowledge, no.

MR. KLEPP: Okay. Thank you.

MS. MOHRFELD: One question.

(EXAMINATION OF DR. McHUGH BY MS. MOHRFELD:)

Q. Doctor, were you an employee of the Graduate Hospital at the time of Mr. Cooney's surgery?

A. No.

MS. MOHRFELD: Thank you.

MR. CURRIER: Anyone else?

MR. SCHWADRON: No questions.

MS. HANSEN: No questions.

MR. CURRIER: Okay. That's it.

(Witness excused.)

(Testimony concluded.)

Certificate

I, Elizabeth A. Landi, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination,

Dennis P. McHugh, D.O.

was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

Elizabeth A. Landi

Elizabeth A. Landi, C.S.R., R.P.R.
Notary Public, State of New Jersey
My Commission Expires May 15, 2003
Certificate No. XI01590
Date: August 25, 2000

# PROGRESS NOTES

Op Note

2/26/98 PreOp Dx: OTD (R) knee
PostOp Dx: Same
Procedure: TKA (L)
Surgeon: Bartolozzi (S) McHugh
Anes: Spinal
TT: 54 min (400)
UO: Ø
FR: 1200 cc LES Turnt PRBC
Cx: Ø
To RR stable

2/26/98 GU op Note

Surgeon: TRAMESSO
Preop dx: Artificial urinary sphincter
Post op dx: same
Procedure: Deactivation of sphincter
14 Fr Foley placement
Anesthesia: spinal
Recc: ✓ deactivation qday
Reconsult us to d/c Foley & reactivate sphincter when ready for voiding trial.

0 17470
COUNTY, ROBERT E. JR.
DAVIS ... 11-17-1924 ... CAT
... 02-26-98
ROBERT E. JR.
... CHELI ST
WAYNE NJ 07470
MEDCARE 98 058076990A
COM. INS. 058076990
3948 T44
78 28 73

12011

44

# PROGRESS NOTES

EXHIBIT #___ DATE ___

[illegible handwritten note]

2/27/98 Surgery op note

pre/post op Dx: Acute (L) LE ischemia

Procedure: (L) fem-[illegible] c cortex, A-V fistula

Surgeons: Mantell, Kirksey, Flynn

Anesthesia: General ET

EBL: 2700 cc

volume 2100 cc PRBC, 6000 cc Normosol, 1000 cc NSS, 1000 cc Albumin

u/o: 1350

Dispo: Pt to MICU → guarded condition

[signature]

WAYNE NJ 07470

MEDICARE 98 0580769990A

COM. INS. 0580769990 120115

PROGRESS NOTES

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

NO. 01-1929

---

ELEANOR M. COONEY, As Executrix of the
Estate of Daniel T. Cooney, Jr., Deceased;
ELEANOR M. COONEY; ELEANOR SCHIANO;
HELEN E. COONEY MUELLER; DANIEL T. COONEY, III;
ROBERT COONEY INDIVIDUALLY,

Appellants

v.

ROBERT E. BOOTH, JR., M.D.; ARTHUR R. BARTOLOZZI, M.D.;
DAVID McHUGH, D.O. (Fictitious First Name);
DAVID G. NAZARIAN, M.D.; JOHN DOE, M.D., (FICTITIOUS NAME);
BOOTH, BARTOLOZZI, PENN ORTHOPAEDICS;
MARK MANTELL, M.D.; RECOVERY ROOM STAFF;
JANE DOE, JOHN ROE, ET AL., (FICTITIOUS NAMES)
GRADUATE HOSPITAL, (Formerly Allegheny Graduate Hospital);
PENNSYLVANIA HOSPITAL; ROBERT E. BOOTH, JR., M.D.;
MARK MANTELL, M.D. PERSONALLY;
BOOTH, BARTOLOZZI, BALDERSON,
PENN ORTHOPEDICS CORPORATION; DENNIS McHUGH

---

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 00-cv-01124)
District Judge: Honorable Eduardo C. Robreno

---

Argued January 23, 2002

46

BEFORE: NYGAARD and STAPLETON, Circuit Judges, and CAPUTO, District Judge*

(Opinion Filed February 12, 2002 )

---

Helen E. Cooney Mueller (Argued)
Cooney & Mueller
8 Erli Street
Wayne, NJ 07470

Attorney for Appellants

Paul E. Peel (Argued)
O'Brien & Ryan
Suite 300 Hickory Pointe
Plymouth Meeting, PA 19462

Attorney for Appellees

---

MEMORANDUM OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

Appellants' decedent, Daniel T. Cooney, Jr., consented to have Dr. Robert Booth perform knee replacement surgery, but another surgeon. Dr. Arthur Bartolozzi. performed the bulk of the surgery. After the surgery. Cooney's foot became discolored

---

* Honorable A. Richard Caputo, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

and no pulses were palpable. Bartolozzi and Booth consulted a vascular surgeon, Mark Mantell. Mantell had to perform additional corrective surgery to repair a tear in the popliteal artery. Cooney died as a result of secondary complications from the vascular surgery.

Cooney's estate and individual family members filed suit against Booth, Bartolozzi, Mantell, and a number of other entities. The District Court granted summary judgment to Bartolozzi. Plaintiffs voluntarily dismissed all other defendants except Booth. A jury returned a verdict in favor of Booth.

At trial, plaintiffs pursued three theories of liability: (1) Dr. Booth committed malpractice by performing the knee surgery on Cooney despite the fact that Cooney suffered from peripheral vascular disease, and (2) Dr. Booth committed battery on Cooney by causing him to be operated on without his informed consent in that (a) Booth failed to advise him of the additional risk of knee surgery arising from his peripheral vascular disease, and (b) Cooney consented only to an operation by Booth and Booth exceeded the scope of that consent by causing most of the surgery to be performed by Dr. Bartolozzi.

Prior to or during trial, plaintiffs' counsel submitted a proposed instruction (Charge "No. 6 INFORMED CONSENT") to the Court pertaining to their two informed consent/battery theories. At the conclusion of the evidence, the Court provided counsel with a tentative set of jury instructions and conducted a charge conference. The

conference began with the following advice from the Court and response by plaintiffs' counsel:

> THE COURT: . . . The motions are now closed. We'll proceed now to the charge conference.
>
> I have provided you with a draft of my proposed jury instructions. The draft embodies all of my rulings on the instructions that you have submitted [to] me, so that if they're not included in the jury instructions, they have been tentatively denied. If they have been included in a modified fashion, those rulings are my tentative rulings, subject to hearing your comments and your objections to that.
>
> So why don't we start with Mr. Klepp for the plaintiff[s].
>
> MR. KLEPP: Judge, my first impression was that perhaps the court did not put in its draft of the charge the increased risk and substantial factor, which is embodied in the model charge 10.03B, but upon review, further review, I see that it is in there.
>
> THE COURT: Okay.
>
> MR. KLEPP: Also, I do not believe that the charge has anything in it with regard to the informed consent regarding battery under the cases that we have previously cited to the Court, particularly plaintiffs' request to Charge No. 6. I certainly would ask that that be included in the Court's charge with regard to the informed consent/battery.

The Court's tentative instructions were not made a part of the record so we do not know what they said with respect to informed consent. It is clear, however, that the charge ultimately given to the jury addressed both of plaintiffs' informed consent

theories at some length, describing them in substantially the same manner as the requested Charge No. 6.[1] Contrary to appellants' insistence, the Court's instructions with respect to those theories do not suggest in any way that the plaintiffs had to prove that Dr. Booth was negligent in any way. On the contrary, the Court instructed that:

> A physician who medically treats a patient, without the patient's informed consent, commits a battery on the patient and []is liable for all injuries the patient suffered as a result of that medical treatment, regardless of the care exercised in the performance of the treatment.

While the Court did instruct on the concept of negligence, it did so solely in the context of plaintiffs' malpractice claim.

Immediately after the jury charge, the Court called a sidebar conference and expressly inquired of counsel whether they had any objections to the charge as given. Plaintiffs' counsel replied, "No, sir."

---

[1]The Court charged in part:

> The plaintiffs first alleges [sic] that the defendant committed medical malpractice in his treatment of Daniel T. Cooney, Jr., and violated the Doctrine of Informed Consent. Specifically, plaintiffs' [sic] claim that the defendant, Dr. Booth, committed medical malpractice by performing knee replacement surgery on Daniel T. Cooney, Jr., despite the fact that Mr. Cooney suffered from peripheral vascular disease. In addition the plaintiffs' [sic] claim that Dr. Booth violated the Doctrine of Informed Consent by failing to inform Mr. Cooney of the increased risks of having knee replacement surgery with the preexisting condition of peripheral vascular disease, and failing to perform the knee replacement surgery himself, but instead having that surgery performed by his partner, Dr. Bartolozzi. Now, the defendant denies that he committed medical malpractice, or that he violated the Doctrine of Informed Consent.

The Verdict Sheet contained the following two questions, among others, that the jury answered with a "No:"

> 1. Do you find that the defendant Robert E. Booth, Jr., M.D. was negligent?
>
> * * *
>
> 3. Do you find that the defendant Robert E. Booth, Jr., M.D. violated the doctrine of informed consent?

We have carefully compared plaintiffs' requested charge No. 6 with the portions of the actual charge directed to the same subject matter and we find no material difference. Moreover, to the extent there are any differences at all, given the District Court's comprehensive treatment of the informed consent/battery theories in its charge, the alleged errors now pointed to by appellants clearly were not preserved by counsel's general objection at the charge conference.

We are mindful of the fact that it is not necessary to object to an erroneous portion of a charge after it is given where the court previously has unambiguously and finally rejected an objection "stating distinctly the matter objected to and the grounds of the objection." F.R.Civ.P. 51. See Smith v. Borough of Wilkinsburg, 147 F.3d 272 (3d Cir. 1998). The purpose of Rule 51, however, is to ensure "that the district court is made aware of and given an opportunity to correct any alleged error in the charge before the jury begins its deliberations." Id. at 276. Here the District Court had not finally rejected Charge No. 6 at the time of the charge conference and, absent a specific objection

following the actual charge, it had no way of knowing that its efforts to accommodate the general objection made at the conference had not been wholly successful.

The charge as given contains no plain error. The judgment of the District Court will be affirmed.

...ecords?
A. Yes.
Q. February 26, 1998?
A. Yes.
Q. Daniel Cooney. Last sentence says, The attending physician was present for the key portion of the procedure including the soft tissue balancing, bone preparation, and prosthesis implantation, and was immediately available throughout the entire procedure.

Who are they referring to or who is the author of this report referring to as the attending physician?
A. Well, the report is generated by computer. The way this works is that as we go through the case, we identify the pathology to the nurse, the size of the parts, the particulars of the case and then the report is typed -- presuming there's no problem, no variation from a standard total joint replacement, then this is automatically typed up from a template, from a form.

If there is any problem or anything different or unusual or a revision or things like that, then we separately dictate an addition to this or an entirely separate report, however the

attending physician they're talking about is myself.

Dr. Bartolozzi was there as well as my partner, but I'm the -- primarily the one responsible for Mr. Cooney, and I was there for the cutting of the bone, certainly all of the soft tissue preparation and leaving as the parts are being cemented into position.
Q. Okay. Why would you be designated as the attending physician when this was a team effort, is there any reason for that that you know?
A. I'm the oldest. I'm the one who saw Mr. Cooney first. I'm, at least for the knee part of the practice, the leader of that team.
Q. Are you the only one who saw Mr. Cooney prior to surgery during the office visits before surgery?
A. No, Dr. Nazarian saw him, too. Dr. Bartolozzi and I have office hours together only one day a week. We work in a big open area, not in little examining room cubicles like most physicians, so that the patients get to see all of us. There's a whole -- I mean we truly work as a team and move from place to place as a team.

All our nurses are interchangeable, our residents are taught a procedure that is done identically from one room to the other so they can move from room to room if there are things that they need to see for their education. The process is the same throughout.

And at our level, we're all interchangeable, too. We all do knee replacements. Dr. Bartolozzi doesn't do hip replacements, that's the only difference, he prefers knees.

But aside from that, we are -- we see the patients in the recovery room, we follow them up in the office together. That's how we function.
Q. Okay. And you said that you do both knee replacement and hip replacement?
A. It's converting. I used to do more hips than knees and now I'm in another phase and I'm doing more knees than hips and Dave Nazarian is sort of my mirror image. He does most of the hips and some of the knees.
Q. And Dr. Bartolozzi does --
A. Exclusively -- well, he does other joints other than -- he does the shoulders and all sorts of sports medicine things, but in the knee area,

he does knee replacement and soft tissue surgery, the sports procedures.
Q. How long, if you know, has Dr. Bartolozzi been involved in knee replacement surgery?
A. Since he was my resident, 20 years ago roughly.
Q. And how long has Dr. Nazarian been involved in --
A. From the beginning of his training, seven or eight years, I would guess.
Q. And how long have you been involved in hip replacement as opposed to knee replacement surgery?
A. Twenty-five years.
Q. And when did you get involved in hip replacement -- knee replacement surgery?

MR. O'BRIEN: Excuse me. He's not saying that they were mutually exclusively. Why don't you ask him --

THE WITNESS: Total hips were the first successful joint, that's what most of us did in the beginning. The total knees lagged five or ten years behind, so there's sort of an overlap there. Not just in our practice, around the world.

BY MR. KLEPP:
Q. Right. So then throughout your orthopaedic practice, you had been involved in both knee and hip replacement?
A. Yes.
Q. Okay. When you left Mr. Cooney during the course of the surgery at the time that the cementing was being done and the closing, did you go on to another patient in the operating room?
A. Yes.
Q. In the same operating room or in another -- I assume another operating room?
A. Another operating room.
Q. Okay. What time that day did you finish surgeries, do you remember?
A. I don't recall.
Q. Was Mr. Cooney one of the last ones that day, do you remember?
A. I don't remember.
Q. We were talking before about Dr. Mantell's involvement and your understanding that Mr. Cooney suffered a clot or a thrombus in the popliteal. You referred then to Dr. Mantell's operative note.
Any other record in the hospital chart or

in any of your records that tell you that it was a clot or a thrombus in Mr. Cooney's artery?
A. It is in medical notes and other things that I don't know. I could find at the moment.
Q. What medical notes of -- that are in the hospital chart?
A. I believe so, yes. I don't recall specifically where, but I believe that was all of our -- all the people caring for Mr. Cooney were under the impression that that's indeed what happened to him, so I believe that it's mentioned in other places.
Q. Have you had discussions with other people that were caring for Mr. Cooney about Mr. Cooney's condition and what did happen to him?
A. As I told you, our entire staff, whenever we have a problem, gets together and talks about it. We're very upset by complications and so we talk about what we thought happened and --
Q. What were the discussions about? Who took part in the discussions?
MR. O'BRIEN: When?
BY MR. KLEPP:
Q. Well, let's talk about the first one that

you had. When was the first discussion that you had about Mr. Cooney's uncord (phonetic) event as a result of surgery?
MR. O'BRIEN: Objection to form.
THE WITNESS: Dr. Bartolozzi and Dr. Nazarian and I were all talking about this that day as we were available. You have to understand, we were still operating and taking care of other things, so whenever we could get together, we would say how is Mr. Cooney's foot doing, what do you think happened, what should we do now. This was an ongoing discussion among the three treating physicians -- three attending physicians.
Q. Was this before, during, or after Dr. Mantell's involvement?
A. What I'm just describing was before. This is while we were waiting to see and hoping that the foot would start looking better and that the pulse would improve even further.
Q. How long was this wait before Dr. Mantell was involved in Mr. Cooney's treatment?
A. I don't remember precisely when he was called. I don't know.
Q. Okay. What was being done for Mr. Cooney,

as far as you know, during that period of time from the conclusion of the surgery until Dr. Mantell's involvement?
A. He was in the recovery area, he was still recovering from his anaesthetic. His limb had been unwrapped to take the pressure off it. His knee machine had been stopped, most patients go into a device that keeps their knee moving, that had been put at rest, and the nurses were monitoring the warmth and the color and the Doppler pulsing of his foot.
Q. Who is Dr. Flynn? Do you know a Dr. Flynn at Graduate Hospital?
A. I don't know that name.
Q. Do you recall seeing his name in any of the notes involved in Mr. Cooney's care?
A. I don't recall where I've seen it. I have seen his name. Whether it was in his notes or one of the legal documents, I don't recall.
Q. Do you know a Dr. Klein?
A. Yes.
Q. And who is Dr. Klein -- let me -- do you know a Dr. Klein who would have been involved in Mr. Cooney's treatment after surgery?
A. Yes.

A. I must say I'm not sophisticated enough to distinguish between the expert and the treating physician depositions that I give and the lawyers, in my humble opinion, blur the line frequently. I'm asked to give opinions when I'm just a treating physician.

In my own behalf, I've probably had half a dozen depositions. The rest are all related to other patients I've treated and other problems.

Q. What do you mean in your own behalf?

A. For other actions such as this.

Q. Okay. And how many times could that be?

MR. O'BRIEN: Half a dozen.

THE WITNESS: Half a dozen.

BY MR. KLEPP:

Q. Half a dozen. So you're speaking then as a defendant in a medical negligence case?

A. Yes.

Q. Have they been here in Philadelphia?

A. Yes.

Q. All right. Has the action -- have the actions, the civil actions, been filed here in Philadelphia?

A. Yes.

Q. Have any of them involved allegations

regarding damage to the popliteal artery and consequences thereafter?

A. No.

Q. Have you been represented in those other cases that you've been a defendant by O'Brien & Ryan, the law firm of O'Brien & Ryan?

A. In some of them.

Q. How many of them, do you know?

A. I don't recall.

Q. Any of them still pending, still going on?

A. Yes. I have some active cases that are pending, yes.

Q. All right. And I'm sorry, did you say that they were all pending here -- those that have involved you as a defendant have been filed in courts in Philadelphia?

A. Yes.

Q. Okay. Federal courts or --

A. Civil.

Q. Commonwealth court?

A. Commonwealth.

Q. Have any of those actions involved total knee replacement surgeries performed by you?

A. Yes.

Q. All of them?

A. No.

Q. Hip replacement surgeries would be the other involvement?

A. Yes.

Q. Thank you, Dr. Booth. I'm finished.

MS. DANIELE: No questions.

MR. EISENBERG: No questions.

MR. CURRIER: No questions.

MR. LYNCH: No questions.

(Witness excused)

(Testimony concluded at 9:44 a.m.)

CERTIFICATE

I, Stacy A. Shuchman, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination,

Robert E. Booth, Jr., M.D.

was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

Stacy A. Shuchman, C.S.R.
Notary Public, State of New Jersey
My Commission Expires August 13, 2001
Certificate No. XI 02034
Date: July 17, 2000

55



**ALLEGHENY℠ UNIVERSITY HOSPITALS GRADUATE**

One Graduate Plaza
1800 Lombard Street
Philadelphia, PA 19146
215.893.2000

# OPERATIVE REPORT

PATIENT: COONEY, DANIEL
HISTORY NUMBER: 782873
SURGEON: MARK MANTELL, M.D.
ASSISTANTS: LEE KIRKSEY, M.D.
ROD FLYNN, M.D.
ANESTHESIA: GENERAL
ANESTHETIST:

DATE: 02/26/98

PREOPERATIVE DIAGNOSIS: Acute Occlusion of the Left Popliteal Artery, Status Post Total Knee Replacement

POSTOPERATIVE DIAGNOSIS: Same

PROCEDURE: Thrombectomy of Left Popliteal Artery, Above Knee to Below Knee Popliteal Bypass With Reversed Saphenous Vein, Ligation of This Graft and Above Knee Popliteal to Peroneal Bypass With 6 mm Ringed PTFE, Four Compartment Fasciotomy

ESTIMATED BLOOD LOSS: 2700

COUNTS: Needle, Sponge, Instrument Counts Correct

DISPOSITION: SICU in Critical Condition

OPERATIVE PROCEDURE: The patient is an 80-year-old white male who underwent total knee replacement postoperatively. He was noted to have compromise of the vascular supply to the left foot with weakly palpable pulses on the right side and arteriogram was immediately ordered which showed a popliteal occlusion at the level of the knee with no reconstitution distally. He was taken emergently to the Operating Room for thrombectomy and possible bypass.

The patient was taken to the Operating Room where general anesthesia was obtained. The patient was prepped and draped in the usual sterile fashion. A medial below knee incision was made. The saphenous vein was identified and was quite small at this level and would not be adequate for use in the future. The popliteal space was entered and the popliteal artery was dissected free from the surrounding tissues. The patient had been previously heparinized. Vessel loops were placed around the popliteal and a longitudinal incision was made as we suspected we would have to do a bypass in the future. The artery was entered and there was very poor flow. There were no thrombus seen. ←
A 3 catheter was passed distally with return of minimal amount of blood but no clot. Proximally the catheter was placed and there was no blood flow after two or three passes. Intima was returned and

56