COONEY, DANIEL                    -2-

782873

there was a significant amount of bleeding at this point that appeared to be normal.

At this point this vessel was controlled and using fluoroscopy proximal arteriogram was performed which showed that within the popliteal vessel there was a filling defect consistent with an intimal flap.  This was right behind the knee, and I did not feel that this was an optimal injury to repair primarily, therefore, we chose to do a bypass.

At this point an incision was made in the groin and the saphenous vein was exposed.  The entire vein was small and although at the saphenofemoral junction it was adequate.  It bifurcated early and would not admit a 3 mm dilator.  However, despite this we decided to go ahead and use it for a bypass as I was worried about using PTFE below the knee, there was no other conduit that would have been better.  Therefore, an above knee popliteal incision was made and the popliteal artery was controlled.  Of note the below knee popliteal artery was without significant disease but the intima was quite friable and although there was no occlusive disease, any time we handled it it did create an intimal flap.

At this point the above knee popliteal artery was controlled with vessel loops and the vein was then taken from the thigh and tied distally with 2-0 silk tie and at the saphenofemoral jaunction with 2-0 silk tie.  The vein was gently distended with heparinized saline and was somewhat larger but could not admit a 3 mm dilator in the end portion of the vein.  Because we wanted to use as little of the narrowed vein as possible, we did the distal portion first. The below knee popliteal vessel was controlled and we did an end-to-end anastomosis to the popliteal vessel.  This was performed and not end-to-side as I felt that the intimal defect could occlude and trash clot down the vessel. Additionally, if it stayed open there would be significant competitive flow and the bypass would be in jeopardy.

So, an end-to-end anastomosis was performed with 6-0 prolene suture. The vein was then flushed and anastomosis was hemostatic and flushed easily. The vein was then pulled through the anatomic popliteal space to the above knee popliteal and end-to-side anastomosis was done at this level. We did have to use some of the smaller portion of the vein.  Once this was performed we had a distal pulse but the foot still looked quite ischemic.  Of note prior to revascularizing, we did a four compartment fasciotomy.  We used a scissor to open the superficial and posterior compartments and additionally a lateral incision was made to decompress anterior and lateral compartments. All muscle appeared viable even prior to revascularization.  The proximal anastomosis was finished and there was a palpable pulse. However, the doppler signal was not a good one and it sounded like there was obstructed flow and arteriogram showed a very small vein and questionable filling defects and questionable disease at the anterior tibial take off.  Even after removing the filling defects, the vein

*57*

COONEY, DANIEL                    -3-

782873

would be too small, I decided we would have to use PTFE.   Therefore,
a 6 mm PTFE was obtained, the popliteal was controlled and we used the
hood of the vein graft anastomosis to anastomose the 6 mm PTFE to this
with 6-0 PTFE suture.  Once completed there was excellent flow through
the graft.  It was then placed through the anatomic tunnel.  The vein
graft that we had done was ligated with a 3-0 silk tie.  It was then
placed through the anatomic tunnel.

Because of the questionable filling defect at the take off of the
anterior tibial also the vessel was small and quite diseased and the
fact that the peroneal further down looked pristine and was large, we
decided to go to the tibial vessel.  I felt that blood flow would go
to the foot through the collaterals from the peroneal as well as
through retrograde flow up the peroneal and over to the anterior
tibial.  We did not go to the anterior tibial as from our popliteal
incision a lateral approach would be difficult necessitating a lateral
incision in the above popliteal space or a tunnel through the
interosseous membrane.  Therefore, we went to the peroneal further
down and the gastroc was taken down to expose the vessel and it was
soft.  An accompanying small vein was identified.  The tourniquet was
then placed on the thigh over Webril, the leg was exsanguinated with
an Esmarch bandage.  Of note throughout we were checking ACT's and
he was occasionally getting additional heparin.

The leg was exsanguinated with an Esmarch bandage and the peroneal was
entered and was a nice vessel.  Also the accompanied peroneal vein was
opened and these were sewn side-to-side with 6-0 prolene suture. We
decided to do the fistula in order to hopefully improve the patency of
this graft.  Once this was performed on top of the distal anastomosis,
we placed the PTFE graft with running 7-0 PTFE suture.  Once completed
there was a good pulse in the distal artery, however, multiple
arteriograms were obtained which looked like a complete Steel through
the fistula. We ligated the distal part of the fistula without
significant change and what I felt was the proximal part of the
fistula but we were not successful.  Therefore, we replaced the
tourniquet and took the anastomosis down and took down the fistula and
tied off the vein.  We just went end-to-side from PTFE to the peroneal
without a vein cuff or fistula.  The foot was quite ischemic at this
point and we did not want to delay any further.  An end-to-side
anastomosis was performed with running 7-0 PTFE.  Once completed there
was a good pulse in the distal artery and arteriogram revealed good
anastomotic technique with flow down the peroneal and up into the
anterior tibial.  No flow was seen into the foot.  This is most likely
secondary to the very ischemic nature and spasm in the vessel.  I did
not believe that it was from thrombin as we had not seen thrombin
throughout the whole case and the popliteal occlusion was just from
the intimal occlusion and no thrombus was even seen at this point.

At this point absolute hemostasis was obtained.  Because of the
significant swelling in the lower leg things were difficult to bring
together.  Laterally it was not a problem and the fasciotomy incision

*58*

COONEY, DANIEL                    -4-

782873


was closed with a running 3-0 Vicryl subcutaneous tissue and staples
for the skin.  Medially we were able to close the most inferior
portion of the wound, however, we were only able to close the
subcutaneous portion of the wound in the below knee popliteal space
with interrupted 2-0 Vicryl sutures.  This was quite important
obviously as this was where exposed PTFE graft would be.  The above
knee popliteal and other thigh incisions were closed with interrupted
2-0 Vicryl in the subcutaneous tissue and staples in the skin.

At this point the foot still remained quite ischemic appearing, but
the ischemic time was quite long at this time and we wished to see how
he would reprofuse.  The revascularization was as good as it was going
to be at this point.  At this point he was taken in critical condition
to the SICU. The family was notified of the results.


   /TL132/2464
DD:02/27/98
DT:03/02/98                    MARK MANTELL, M.D.

**BUSINESS**

# Suit claims unnecessary surgeries at Tenet

## The action is the most recent development in allegations that doctors at the hospital chain's subsidiary performed unwarranted procedures to boost revenue.

By _____, *AMNews* staff. May 19, 2003.

Tenet Healthcare Corp., the nation's second largest for-profit hospital chain, is being sued for allegedly creating heart patients out of healthy people as a means of boosting revenue.

A joint complaint representing 82 patients was filed in a Shasta County (Calif.) Superior Court on April 28. The lawsuit claims that doctors at the Redding Medical Center performed hundreds of unnecessary invasive heart procedures -- including some that led to death -- to increase profits at the Tenet subsidiary.

With this article
■ See related content

Tenet, the medical center and a half-dozen physicians are named as defendants in the lawsuit, which seeks unspecified compensatory and punitive damages for fraud, battery, conspiracy, wrongful death, abuse, negligence and more.

Attorney Robert Simpson, who filed the complaint, said Tenet's business practices were behind the alleged wrongdoing. "We believe that the Tenet health system practices what we call 'Wall Street medicine;' They practice bottom-line medicine to drive their stock prices up."

Simpson said he expects hundreds of additional patients to file claims in the next few months.

A spokesman for Santa Barbara, Calif.-based Tenet declined to comment on the lawsuit, citing a company policy about pending litigation.

60

Wednesday, Jan. 19, 2005

## Tenet Pays $395 Million to Settle Heart Surgery Suit

By Jason Schossler
Health Law Litigation Reporter

Hospital operator Tenet Healthcare Corp. has agreed to pay $395 million to settle a lawsuit brought by former cardiac patients who say that one of its California hospitals repeatedly performed unnecessary heart surgeries.

In an agreement reached with the patients' attorneys, Tenet will arrange for the money to be allocated among more than 750 patients who had filed civil lawsuits against the corporation and its subsidiaries. The cases arose from allegations that certain doctors performed unnecessary cardiac catheterizations and bypass surgeries while practicing at Redding Medical Center in California.

The litigation against the individual physicians, however, is not part of the agreement.

"We believe this settlement is the fair and honorable way to conclude this very sad chapter," Tenet CEO Trevor Fetter said in a statement. "It would likely have taken multiple trials and many years to assess liability in these cases. By settling all the cases at once, we put this matter behind both the plaintiffs and us, and we bring closure to this unfortunate event."

Plaintiffs' attorney Robert G. Simpson of Reiner, Simpson, Timmons & Slaughter in Redding, Calif., said the firm is "extremely proud" of its clients and is pleased that they are being compensated for the "egregious acts" committed against them.

"This has been a long and difficult road for our clients," Simpson said in a press release confirming the settlement. "They courageously stood up for their rights against tremendous criticism from a community that did not understand the depth of deception behind these unnecessary surgical procedures."

Simpson's firm represented more than 345 patients who allegedly underwent unnecessary cardiac procedures, as reportedly confirmed by board-certified cardiologists and cardiovascular surgeons.

"Our clients and their families suffered horrible complications such as death, amputations, heart and brain surgery, loss of mental acuity, and strokes because of these unnecessary procedures," liaison counsel Russell Reiner said in a statement.

Houston law firms Moriarty & Leyendecker and Hackerman Frankel also represented former patients in the cases.

The settlement agreement is still subject to approval by the individual plaintiffs and other customary court requirements.

61

Case 2:04-cv-01272-JLL-RJH   Document 33-6   Filed 08/25/05   Page 6 of 27 PageID: 593

**8/30/01**

> **COMPANY/PERSON:** Dr. Robert E. Booth and
> Healthgrades, Inc. (successor-in-interest to
> Reconstructive Orthopaedic Associates)
> **ALLEGATIONS:** False claims to Medicare for surgery
> performed by residents when Dr. Booth was not present
> **AMOUNT:** $1,888,837.90 paid by Dr. Booth; $200,000
> paid by Healthgrades, Inc

62





Fried, Frank, Harris, Shriver & Jacobson
1001 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20004-2505

Helen Mueller
45 Swiss Terrace
Wayne, NJ  07470



Fried, Frank, Harris, Shriver & Jacobson
1001 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20004-2505

63

*JF*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

United States of America          :
                                  :
          Plaintiff,              :
                                  :
                                  :
     v.                           :Civil Action No. O1cv4432
                                  :
                                  :    Jury Trial Demanded
                                  :
Robert Booth, M.D.                :
Healthgrades, Inc., formerly      :
Reconstructive Orthopaedic        :
Associates, P.C.,                 :
a/k/a Ortho Recon Assoc,          :
d/b/a The Rothman Institute       :
                                  :
          Defendants.

## SETTLEMENT AGREEMENT

64

the "Covered Conduct".

D.   The United States also contends that the HHS-OIG has certain administrative claims with respect to the Covered Conduct under the provisions for permissive exclusion from the Medicare and Pennsylvania Medicaid programs, 42 U.S.C. § 1320a-7(b), and civil monetary claims or penalties under 42 U.S.C. § 1320a-7a and 31 U.S.C. §3801-3812 (collectively, "Administrative Claims") for the Covered Conduct.

E.   Dr. Booth and ROA deny the contentions of the United States as set forth in Paragraphs (A)-(D), above, and deny any liability in connection with the "Covered Conduct."

F.   In order to avoid the delay, uncertainty, inconvenience and expense of protracted litigation of these claims, the Parties reach a full and final settlement as set forth below.

## III.   TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, and obligations set forth below, and for good and valuable consideration as stated herein, the Parties agree as follows:

1.   Dr. Booth agrees to pay to the United States

3

65

$1,888,837.90 (One million, eight hundred eighty-eight thousand, eight hundred thirty-seven dollars and ninety cents)("Booth Settlement Amount"). ROA agrees to pay the United States $200,000 (Two hundred thousand dollars) (ROA Settlement Amount"). The payments will be made by electronic transfer pursuant to instructions from the United States Attorney's Office for the Eastern District of Pennsylvania. The payments can be made in installments so long as the full payment is made on or before February 2, 2002.

2. Subject to the exceptions in Paragraph 4 below, in consideration of the obligations of Dr. Booth and ROA set forth in this Agreement, conditioned upon payment in full of the Booth Settlement Amount (with respect to Dr. Booth), the payment in full of the ROA Settlement Amount (with respect to ROA), and institution and compliance with the Integrity Agreement set forth in Attachment A (with respect to Dr. Booth), and subject to Paragraph 11, below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement), the United States agrees to, and does hereby, release any "Civil Claims" (as defined in paragraph C above) it has or may have, against Dr. Booth, ROA and the successors and/or assigns of ROA's provider number and

4

66

INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
ROBERT BOOTH, M.D.

## I.   PREAMBLE

Robert Booth, M.D. ("Dr. Booth") hereby enters into this Integrity Agreement ("Agreement") with the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS") to promote Dr. Booth's compliance with the statutes, regulations, program requirements and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f))("Federal health care program requirements").  This commitment to promote compliance applies to any entity that Dr. Booth owns or in which Dr. Booth has a control interest, as defined in 42 U.S.C. § 1320a-3(a)(3), and Dr. Booth's and any such entity's employees, agents, contractors and all third parties with whom Dr. Booth or such entity may choose to engage to act as billing or coding consultants for purposes of claiming reimbursement from the Federal health care programs ("Covered Persons"). Contemporaneously with this Agreement, Dr. Booth is entering into a Settlement Agreement with the United States, and this Agreement is incorporated by reference into the Settlement Agreement.

## II.   TERM OF THE AGREEMENT

Except as otherwise provided, the period of compliance obligations assumed by Dr. Booth under this Agreement shall be five years from the effective date of this Agreement.  The effective date of this Agreement shall be the date on which the final signatory executes this Agreement.

Sections VII, VIII, IX, X and XI shall remain in effect until OIG has completed its review of the final annual report and any additional materials submitted by Dr. Booth pursuant to OIG's request, but in no event later than 120 days after the OIG's receipt of (1) Dr. Booth's final annual report; or (2) any additional materials submitted by Dr. Booth

1

**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF PENNSYLVANIA
U.S. COURTHOUSE
INDEPENDENCE MALL WEST
601 MARKET STREET
PHILADELPHIA, PA 19106-1797

MICHAEL E. KUNZ
CLERK OF COURT

CLERK'S OFFICE
ROOM 2609
TELEPHONE
215-597-7704

July 16, 2002

Eleanor Schiano
11 Susan Avenue
Wayne, NJ   07470

Re: 01-4422

Dear Ms. Schiano:

Enclosed are the copies you requested concerning the within referenced case.

Very truly yours,

Michael E. Kunz
Clerk of Court

By: Margaret R. Stipa
Deputy Clerk

Enclosure
Receipt # 795878

68

**JF**

①

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

United States of America   :
            :
    Plaintiff,    :
            :
    v.      :Civil Action No. 01CV4422
            :
            : Jury Trial Demanded
Robert Booth, M.D.    :
Healthgrades, Inc., formerly :
Reconstructive Orthopaedic  :
Associates, P.C.,    :
a/k/a Ortho Recon Assoc,  :
d/b/a The Rothman Institute :

    Defendants.

# FILED

AUG 3 0 2001

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

## COMPLAINT

1. The United States Attorney for the Eastern District of
Pennsylvania brings this action against Dr. Robert
Booth and Healthgrades, Inc., the successor-in-interest
to Reconstructive Orthopedic Associates through a state
law merger transaction, (hereinafter, "the defendants")
for the fraudulent scheme of submitting and/or causing
the submission of false claims to the Medicare Program
and Pennsylvania Blue Shield and XACT  for payments
made for Medicare beneficiaries in violation of the

1

S69

False Claims Act, 31 U.S.C.A. § 3729.   The United States also seeks restitution of monies under common law theories of fraud, payment under mistake of fact and unjust enrichment, for conduct by the defendants.

2.   The False Claims Act provides that a person or entity who knowingly submits or causes the submission of a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty up to $10,000.00 for each such claim, plus three times the amount of the damages sustained by the Government.

3.   Based upon these provisions the United States seeks to recover damages and civil penalties arising from Defendants' presentation of false claims and statements to the United States in connection with medical services provided to Medicare patients.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over this action pursuant to 28 U.S.C.A. §§1331, 1345 and 31 U.S.C.A. §3729.

5.   Venue lies in this judicial district pursuant to 28 U.S.C.A. §1391 (b) since defendants reside in the Eastern District of Pennsylvania or were incorporated

70

therein and their place or places of business were
located within this District during the relevant time
and the events that give rise to the Government's
claims occurred in this District.

PARTIES

6.   Plaintiff is the United States of America acting for
     itself and for the Medicare Trust Fund and the
     beneficiaries thereof.

7.   Defendant, Robert Booth, M.D. is a citizen of the
     United States of America, who currently resides within
     the Eastern District of Pennsylvania, and who conducts
     business and rendered Medicare services within the
     Eastern District of Pennsylvania and who has performed
     numerous acts proscribed by 31 U.S.C.A. §3729 within
     the Eastern District of Pennsylvania.

8.   Defendant Healthgrades, Inc., the successor-in-interest
     to Reconstructive Orthopedic Associates through a state
     law merger, was a professional corporation in
     Pennsylvania,  Medicare provider number 171384,  doing
     business within the Eastern District of Pennsylvania
     and has performed numerous acts proscribed by 31 USC

3

71

§3729 within the Eastern District of Pennsylvania.
Reconstructive Orthopedic Associates submitted claims
to Pennsylvania Blue Shield and XACT for services
allegedly performed by Dr. Booth.  On November 12, 1996
Reconstructive Orthopedic Associates merged into
Specialty Care Network, Inc., a Delaware corporation.
In 1999 Specialty Care Network, Inc. changed its name
to Healthgrades.com, Inc. and in 2000 changed its name
to Healthgrades, Inc..  Healthgrades, Inc. (hereinafter
ROA) succeeded to all of the liabilities of
Reconstructive Orthopedic Associates.

## BACKGROUND

9.  Medicare has funded graduate medical education (GME)
since the inception of the Medicare program in 1966
under the Part A program of Medicare, which generally
covers the costs of hospital services.  Included in the
GME payment to each hospital is the cost of supervision
and teaching of residents by attending physicians.

10. Under Part B of Medicare, (which generally covers the
costs of physician's services and other non-hospital
services), a supervising physician may bill Medicare
for necessary services which he or she directly and

4

72

personally provides to a patient. In addition, until July 1996 if a supervising physician qualified as an "attending physician" for a particular patient, he or she was permitted to bill Part B for services that the residents provide to patients under the attending's direct supervision and control and in the attending's presence. Time spent by attending physicians supervising and teaching residents was not reimbursable under Part B; it was already provided for by the GME payment under Part A.

11. Under the GME rules in effect prior to July 1996 in order for a physician to bill for services under Part B for major surgical procedures, the attending physician 1) must personally supervise the residents involved in the care; 2) be ready to perform any service performed by an attending physician in a non-teaching setting; 3) the attending physician's presence had to be necessary (not superfluous); and 4) the provision of personal and identifiable services must be substantiated by appropriate and adequate documentation entered personally by the physician in the hospital chart.

12. In July 1996 the regulations concerning payment for

73

Part B payments to supervisory (now known as teaching) physicians were rewritten.  The physician no longer needs to be the patient's "attending physician", but rather the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire procedure.  The physician's presence is no longer required during opening and closing of the surgical field unless these activities are considered to be key or critical portions of the procedure. Presence in the operating suite, but not the operating room is not sufficient. During the portions when the surgeon does not have to be present, the surgeon must be immediately available to return to the procedure, not involved in other procedures from which he cannot return.   The teaching surgeon must personally document the key portion of both procedures in his or her notes in order that a reviewer may clearly infer that the teaching physician was immediately available to return to either procedure in the event of complications.  If the physician is involved in 3 concurrent surgical procedures the role of teaching surgeon is classified

6

74

as a supervisory service to the hospital and is not payable by Medicare under Part B.

### THE ALLEGATIONS DIRECTED AT DR. BOOTH AND RECONSTRUCTIVE ORTHOPAEDIC ASSOCIATES

13. Dr. Booth is an orthopaedic surgeon, licensed to practice medicine in Pennsylvania.

14. Dr. Booth is a participating doctor in the Medicare program, whose Medicare provider number is 04319.

15. Many of Dr. Booth's patients are Medicare beneficiaries and he has submitted or caused the submission of bills to Medicare for, among other medical procedures, orthopedic surgeries, and office visits for Medicare beneficiaries.

16. For services rendered during the period from January 1, 1995 until June 30, 1997 (the "subject period" )   Dr. Booth has caused the submission of bills to Medicare for work that was performed by a resident or fellow, not by Dr. Booth and not in his presence.

75

17. During the subject period Dr. Booth routinely scheduled his patients for knee and hip replacement and revision surgeries (hereinafter "surgeries") in four operating rooms during each day.  The rooms were numbered 1 through 4.

18. Dr. Booth performed the surgeries scheduled in operating room 4.  Dr. Booth was often not assisted by any residents in that operating room.

19. Operating rooms 1, 2, and 3 were staffed by residents and/or fellows who were in the GME Program run by Thomas Jefferson University Medical School.

20. Dr. Booth allowed the residents and fellows to operate on his patients in operating rooms 1-3 while he was operating in operating room 4. With very few exceptions Dr. Booth was not present during all critical portions of the procedure and was not immediately available to furnish services during the entire procedure, for surgeries which took place in operating rooms 1, 2 and 3.

21. Dr. Booth dictated the operative note for patients in operating room 4.  He dictated almost no operative notes for surgeries occurring in operating rooms 1, 2

76

and 3.  He wrote no other notes in his patients' charts.  The patients' hospital charts for operating rooms 1, 2 and 3, prepared by residents, nurses or other medical personnel, did not reflect Dr. Booth's presence at any time in Operating Rooms 1, 2, and 3.

22.  Dr. Booth billed Medicare for operations for Medicare patients in all four operating rooms during the subject period.  ROA submitted these claims to Pennsylvania Blue Shield and XACT for Dr. Booth.

23.  Dr. Booth and ROA submitted false or fraudulent claims or caused the submission of false or fraudulent claims to Medicare for operations conducted by residents and fellows outside of Dr. Booth's presence.

COUNT ONE

(31 U.S.C.A. §3729 (a)(1) and (3))

False Claims Act

24.  Plaintiff realleges and incorporates herein by reference paragraphs 1 through 23.

25.  Defendants Booth and Reconstructive Orthopaedic Associates submitted or caused the submission of false

9

77

or fraudulent claims for payment by the United States and/or conspired to defraud the Government by getting a false or fraudulent claim allowed or paid.

26. Defendants Dr. Booth and ROA submitted or caused the submission of these false or fraudulent claims with actual knowledge that the claims were false, or they were deliberately ignorant of, and acted in reckless disregard of, the fact that such claims were false, in violation of 31 U.S.C.A. §3729 (a)(1) and (3).

27. Plaintiff, the United States of America, unaware of the falsity of the records and/or statements made, used, or caused to be made or used by Defendants, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted to it.

28. By reason of these actions, the United States has been damaged in an amount to be established.

## COUNT TWO

## (Payment Under Mistake of Fact)

29. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 23.

10

78

30. Plaintiff made payments on claims submitted by, or on behalf of, defendants under the erroneous belief that claims for reimbursement met the requirements of the Medicare rules, guidelines and regulations.

31. The erroneous beliefs of plaintiff were material to the amount of payments made by plaintiff.

32. Defendants have received monies to which they are not entitled as a result of the Medicare payments made by mistake.

33. By reason of the overpayments described above, plaintiff is entitled to recover damages, in an amount to be established.

## COUNT THREE

### (Unjust Enrichment)

34. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 23.

35. Plaintiff paid money to defendants to which defendants were not entitled and defendants have been unjustly enriched.

36. By reason of these payments, plaintiff is entitled to

11

79

the damages incurred by such unjust enrichment, in an amount to be established.

## COUNT FOUR

### (Common Law Fraud)

37. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 23.

38. The false statements made by defendants Dr. Booth and ROA as described above were misrepresentations of material fact.

39. Defendants made the representations with knowledge of their falsity or with reckless disregard of the truth.

40. Defendants made the misrepresentations intending that plaintiff rely upon them in making payments to Dr. Booth and ROA under Medicare.

41. Plaintiff justifiably relied upon defendants' misrepresentations in making payments.

42. Defendants' actions caused plaintiff to be damaged in an amount to be established.

43. Because the conduct of the defendants was knowing, willful and egregious plaintiff is entitled to punitive damages.

12

*80*

WHEREFORE, plaintiff United States of America demands judgment against defendants Dr. Robert Booth and Healthgrades, Inc. (as the successor to Reconstructive Orthopaedic Associates) as follows:

A.   Count One

(1)  Treble the amount of damages sustained by plaintiff, in an amount to be established;

(2)  Assessment of a civil penalty of $10,000 for each false or fraudulent claim that defendants made or  caused to be made;

(3) Assessment of a civil penalty of $10,000 for the conspiracy to defraud the United States;

(4)  All other necessary and proper relief, including costs of this action.

B.   Counts Two, Three and Four:

(1)  An award of damages sustained by plaintiff, in an amount to be established;

81

(2) Pre-judgment and post-judgment interest;

(3) All other necessary and proper relief,

including costs of this action.


MICHAEL L. LEVY
United States Attorney


JAMES G. SHEEHAN
Assistant United States Attorney
Chief, Civil Division
615 Chestnut Street
Suite 1250
Philadelphia, PA   19106


SUSAN DEIN BRICKLIN
Assistant United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA   19106

82

**FRIED FRANK**

| 21st Century Money, Banking & Commerce Alert | Antitrust and Competition Alert | Fried Frank Government Contracts Alert |
| --- | --- | --- |
| Fair Lending Alert | FraudMail Alert | SecMail |



*FraudMail Alert*®

### No. 01-05-10
### May 10, 2001

### Securities Fraud — Civil False Claims Act: Recent Securities Fraud Suit Based on Failure to Disclose *Qui Tam* Suit

A recent securities fraud case indicates that the filing of a whistleblower suit under the *qui tam* provisions of the False Claims Act, or the initiation of an FCA investigation by the Justice Department, may be deemed material information that must be disclosed, even if the case is still under seal and the DOJ has not yet decided whether to intervene. While the disclosure requirements in each case must be evaluated based on the unique facts presented, recent court decisions demonstrate that targets of an FCA suit should also be mindful of risks that can arise out of alleged duties to shareholders or alleged Federal and state securities disclosure requirements.

In *Rosen v. Communication Services Group, Inc.*, No. 00-CV-3878, 2001 U.S. Dist. LEXIS 5706 (E.D. Pa. May 2, 2001), plaintiffs alleged that they were defrauded when they agreed to sell stock in exchange for cash and secured debentures that were convertible to common stock of Universal Teleservices Network Corporation ("UTN"). UTN was owned and controlled by a physician who was, at the time, the target of a government investigation arising out of a sealed *qui tam* suit filed under the False Claims Act relating to an entirely different company in which the physician had an interest. The plaintiffs alleged that they agreed to sell their stock to the defendant (foregoing other potential sales) because of representations that were made regarding the physician's financial condition and the expectation that UTN would make an initial public offering of its common stock within a year. The IPO never occurred.

Plaintiffs claimed they discovered that the controlling shareholder